550 S.E.2d 324

Shirley E.J. GREEN, Personal Representative of the ESTATE OF Marilyn Anne COTTRELL, Appellant,

v.

Willard C. COTTRELL, Personal Representative of the ESTATE OF Martin L. COTTRELL, and National Bank of South Carolina, Trustee of the Martin L. Cottrell Trust, Dated November 21, 1997, Respondents.

No. 3353.

Court of Appeals of South Carolina.

Heard May 8, 2001.

Decided June 11, 2001.

Rehearing Denied Aug. 17, 2001.

F. Craig Wilkerson, Jr., of Rock Hill; John S. Nichols, of Bluestein & Nichols, of Columbia, for appellant.

John G. Frampton, of Chellis & Frampton, of Summerville; Edward D. Buckley, Jr., Stephen P. Groves, Sr., and Stephen L. Brown, of Young, Clement, Rivers & Tisdale, of Charleston, for respondents.

ANDERSON, Judge.

Shirley E.J. Green, as Personal Representative of the Estate of Marilyn Anne Cottrell, appeals the Circuit Court's grant of summary judgment to Willard C. Cottrell, Personal Representative of the Estate of Martin L. Cottrell, and the National Bank of South Carolina, as Trustee of the Martin L. Cottrell Trust. The court held Marilyn Cottrell was not an omitted spouse pursuant to S.C.Code Ann. § 62–2–301. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

In 1996, 56–year–old Martin Cottrell, his brother Willard, and his sister-in-law met with Attorney Thomas Cothran to create Martin's estate plan.[1] Martin told Cothran he wanted his assets to remain in his bloodline. Cothran drafted a will bequeathing Martin's personal property to his brother and devising his home to his father. The remainder of Martin's estate formed a residuary trust for the benefit of his niece and two nephews. Martin executed the will on April 23, 1996.

Martin returned to Cothran's office a year and a half later, this time with his girlfriend, Marilyn Anne Jackson. Martin wanted to revise his estate plan to include Marilyn and to accommodate any future marriage to her, but to keep his

---

1. Cothran had known Martin since 1993.

assets ultimately within his family bloodline. In an affidavit submitted to the Circuit Court, Cothran described this meeting as follows:

5. On November 18, 1997, Affiant met with Marty and Marilyn Anne Jackson to discuss revisions to Marty's estate plan. At this meeting[,] both of them participated in the discussion of how to modify the recently created drafts of Marty's estate plan. Marty again expressed to Affiant his feeling that keeping family assets in the bloodline was very important to him, but benefits to his blood kin would be delayed until after Marilyn['s] life time (sic) needs were taken care of by way of [a] trust for her. Marty had previously told Affiant that he wanted a trust for Marilyn's benefit in such a way that she would have her needs taken care of during her life time (sic)[,] but he stated very clearly that he wanted any assets remaining at her later death to benefit his family. During a two hour conference, Affiant, Marty, and Marilyn fully discussed estate plan options including outright gifts, gifts in trust, provisions for spouse and blood kin, etc. Marilyn expressed appreciation for the provisions made for her and she expressed full agreement that such provisions were fair and appropriate to provide for her and to provide for Marty's brother's family.

6. Marty repeatedly said that he wanted Marilyn to marry him and he made the estate plan provisions for her in contemplation of their eventual marriage. Marty wanted life time (sic) benefits for Marilyn in his estate plan even if they were never married. Affiant, Marty, and Marilyn fully discussed (during the November 18th conference) the estate tax advantages of a trust[,] which qualifies for the federal estate tax marital deduction by providing for a surviving spouse for life and then the remainder being available for the family of the spouse who dies first. This type of trust is commonly referred to as a "Qualified Terminable Interest Trust" or a "QTIP" trust and can save estate taxes only if the parties are legally husband and wife. Marty wanted the trust for Marilyn designed to take advantage of this tax saving device after he and Marilyn were married, but

did not want to have to change his estate plan after they were married. Therefore, the estate plan was designed to put into effect his wishes to protect Marilyn regardless of their marriage, but was clearly (as articulated by Marty and approved by Marilyn) prepared in contemplation of their marriage even though a wedding date was not set at the time of the signing of Marty's estate plan on November 21, 1997.

7. Marty signed his estate plan (Revocable Trust Agreement and Will) on November 21, 1997. Provisions were included for Marilyn's benefit if Marty and Marilyn were not married at the time of Marty's death. Other provisions were included for Marilyn's benefit if they were married at the time of Marty's death. The "QTIP" provisions could only apply if they were married at the time of Marty's death; therefore, on the face of the estate plan, Marty clearly made his estate plan in contemplation of marriage to Marilyn. This is in full accord with Marty's wishes as stated to Affiant during the estate planning process and as explained by Affiant to both Marty and Marilyn.

On April 4, 1998, 58–year–old Martin married 49–year–old Marilyn. Within eleven days of the marriage, both of them were dead. Martin died of an acute myocardial infarction on April 7, 1998. Marilyn died on April 15, 1998, from a cerebellar infarction due to basilar artery thrombosis. Neither Martin nor Marilyn had any surviving children.

Martin did not execute a new will after the marriage. His last will and testament was the one Cothran drafted in 1997. This will, dated November 21, 1997, provided:

I [Martin Cottrell] am not married. I have no children. I have a special friend, MARILYN ANNE JACKSON, for whom I am making certain provisions in my estate plan (whether under this instrument or under any other instrument). *Except as otherwise specifically provided, I intend for these provisions to apply for her benefit whether or not we should ever become husband and wife.*

(emphasis added).

In the will, Martin bequeathed his personal and household effects to Marilyn.

The Revocable Trust Agreement, also dated November 21, 1997, provided:

The Settlor [Martin Cottrell] is not married. The Settlor has no children. The Settlor has a special friend, MARILYN ANNE JACKSON, for whom he is making certain provisions in his estate plan (whether under this instrument or under any other instrument). Except as otherwise specifically provided, *the Settlor intends for these provisions to apply for her benefit whether or not they should ever become husband and wife.*

(emphasis added).

In addition to the Trust Agreement's references to Marilyn as Martin's "special friend," the Agreement contained numerous references to Marilyn as the Settlor's "wife" or "spouse" and the Trust C provisions were only effective in the event Martin and Marilyn married.[2]

---

**2.** Article VI, (1)(a) of the Agreement stated "Trust C shall be all of the Trust estate as to which a "QTIP election" is made. All other assets of the Trust estate including that part which is effectively disclaimed by the *Settlor's special friend (if she is the Settlor's wife)* under paragraph (3) herein shall become a part of Trust B." (emphasis added). It further stated in subsection (c):

The term "QTIP" means "qualified terminable interest property" as defined in the Internal Revenue Code. A "QTIP election" means an election made by the Personal Representative of the Settlor's estate (or other authorized person) made pursuant to Internal Revenue Code *section 2056(b)(7)* or any similar section which has the effect of qualifying any asset to which it applies as part of the marital deduction in the Settlor's estate tax calculation. *No QTIP election may be made if the Settlor's special friend is not the Settlor's wife.*

(italics in original) (emphasis added).

(2) *Disclaimed Property to* **Trust C.** If the Settlor's special friend survives the Settlor *and she is the Settlor's wife* and she or her legal representative makes a qualified disclaimer (as defined in *Section 2518* of the Internal Revenue Code) of (a) any portion of the Trust estate that would otherwise pass to her by the Settlor's Will, or (b) any property that would pass to her outside of the Settlor's Will so as to cause that property to become part of the Settlor's probate estate or the Settlor's taxable estate, the property that is disclaimed shall pass to the trustee (in the same manner as if the Settlor's special friend had predeceased the Settlor) and shall be held, administered, and distributed under the terms of **Trust C.** No disclaimed property shall become a part of **Trust C** *if the Settlor's special friend is not the Settlor's wife.*

(3) *Disclaimed Property to* **Trust B.** *If the Settlor's special friend survives the Settlor and she is the Settlor's wife* and she or her legal

Martin's brother, Willard, was appointed personal representative of Martin's estate. Marilyn's sister, Shirley Green, was appointed personal representative of Marilyn's estate.

By petition dated December 3, 1998, Green filed an action claiming Marilyn was an "omitted spouse" and entitled to Martin's entire estate. The action further alleged breach of contract, unjust enrichment, and the creation of a constructive trust. Besides the entire estate, Green sought the delivery of personal property and homestead exemptions.

On January 4, 1999, Willard Cottrell moved for removal of the action to the Circuit Court. In a motion filed with the court on June 24, 1999, Green sought summary judgment. Willard later moved for summary judgment.

The Circuit Court heard the parties' cross motions on September 8, 1999. The judge subsequently ruled Marilyn was not an "omitted spouse" within the meaning of § 62–2–301 because Martin's will was made in contemplation of his mar-

representative makes a qualified disclaimer (as defined in *Section 2518* of the Internal Revenue Code) of any portion of **Trust C**, the portion that is disclaimed shall pass to the trustee of **Trust B** (in the same manner as if the Settlor's special friend had predeceased the Settlor) and shall be held, administered, and distributed under the terms of **Trust B**.

(italics in original) (emphasis in original, in part, and added, in part).

Article VIII mandated: *"There shall be no Trust C unless the Settlor's special friend is also his wife ; therefore[,] all references in this ARTICLE are to the Settlor's "wife."* (emphasis in original, in part, and added, in part). Trust C provisions directed the trustee to pay all income from the trust to the *Settlor's wife* during her lifetime. At the wife's death, any remaining principal of consent of the Settlor's spouse *if the spouse survived the Settlor.*

Article XII addressed the Marital Deduction Savings Clause for Trust C, stating in pertinent part:

It is the Settlor's intention that the *Settlor's wife* under the provisions of **Trust C** have substantially that degree of beneficial enjoyment of the Trust Estate during her lifetime[,] which the principles of the law of trusts accord to a person who is unqualifiedly designated as the life beneficiary of a trust[,] and the Trustee shall not exercise its discretion in a manner [that] is not in accord with this expressed intention. *The Trustee shall invest the Trust Estate so it will produce for the Settlor's wife during her lifetime an income or use which is consistent with the value of the Trust Estate and with its preservation.* It is expressly provided that the Trustee shall not[,] in the exercise of its discretion[,] make any determination inconsistent with the foregoing.

(emphasis in original, in part, and added, in part).

riage to Marilyn and "Marilyn Anne Cottrell was clearly provided for within the meaning of the omitted spouse statute and that there is no genuine issue of material fact in this regard." The trial judge granted summary judgment to Willard.[3] Green appeals.

## STANDARD OF REVIEW

■ An action under the omitted spouse statute is an action at law. *Timmerman v. Timmerman*, 331 S.C. 455, 502 S.E.2d 920 (Ct.App.1998).

■ "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Bruce v. Durney*, 341 S.C. 563, 565, 534 S.E.2d 720, 722 (Ct.App.2000) (quoting Rule 56(c), SCRCP). This Court will review the granting of summary judgment under the same standard applied by the trial court pursuant to Rule 56, SCRCP. *Murray v. Holnam, Inc.*, 344 S.C. 129, 542 S.E.2d 743 (Ct. App.2001).

## LAW/ANALYSIS

Green argues genuine issues of material fact existed regarding whether Marilyn was an "omitted spouse" under § 62–2–301. Specifically, Green alleges the court failed to take notice of the language of the will that the parties were not married and to weigh the distribution of the assets to determine "if there was a meaningful 'providing for'" of Marilyn.

Section 62–2–301 reads:

(a) If a testator fails to provide by will for his surviving spouse who married the testator after the execution of the will, the omitted spouse, upon compliance with the provisions of subsection (c), shall receive the same share of the estate he would have received if the decedent left no will unless:

---

3. The trial court did not address whether an action under the omitted spouse statute survives the omitted spouse and may be brought by a personal representative. We decline to address that issue.

    (1) *it appears from the will that the omission was intentional;* or

    (2) *the testator provided for the spouse by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown by statements of the testator or from the amount of the transfer or other evidence.*

  (b) In satisfying a share provided by this section, the devises made by the will abate as provided in § 62-3-902.

  (c) The spouse may claim a share as provided by this section by filing in the court and mailing or delivering to the personal representative, if any, a claim for such share within eight months after the date of death or within six months after the probate of the decedent's will, whichever limitation last expires.

(emphasis added).[4]

This statute forms part of the South Carolina Probate Code, which went into effect on July 1, 1987. The legislative purpose behind the Probate Code was:

    (1) to simplify and clarify the law concerning the affairs of decedents, missing persons, protected persons, minors, and incapacitated persons;

---

4. Compare this section with the Uniform Probate Code § 2-301(a) (as amended in 1993), which states:

If a testator's surviving spouse married the testator after the testator executed his [or her] will, the surviving spouse is entitled to receive, as an intestate share, no less than the value of the share of the estate he [or she] would have received if the testator had died intestate as to that portion of the testator's estate, if any, that neither is devised to a child of the testator who was born before the testator married the surviving spouse and who is not a child of the surviving spouse nor is devised to a descendant of such a child or passes under Sections 2-603 or 2-604 to such a child or to a descendant of such a child unless:

(1) it appears from the will or other evidence that the will was made in contemplation of the testator's marriage to the surviving spouse;

(2) the will expresses the intention that it is to be effective notwithstanding any subsequent marriage; or

(3) the testator provided for the spouse by transfer outside the will and the intent that the transfer be in lieu of a testamentary provision is shown by the testator's statements or is reasonably inferred from the amount of the transfer or other evidence.

(2) *to discover and make effective the intent of a decedent in the distribution of his property;*

(3) to promote a speedy and efficient system for liquidating the estate of the decedent and making distribution to his successors;

(4) to facilitate use and enforcement of certain trusts;

(5) to make uniform the law among the various jurisdictions.

S.C.Code Ann. § 62–1–102 (1987) (emphasis added).

■ The omitted spouse statute "attempts to accomplish two ends—carrying out the decedent's probable intent and protecting the still-surviving spouse." David E. Wagner, Article, *The South Carolina Probate Code's Omitted Spouse Statute and In Re Estate of Timmerman,* 50 S.C. L.Rev. 979, 979 (1999).

A surviving spouse who wishes to qualify as an "omitted spouse" must demonstrate:

(1) the decedent spouse executed the will in question prior to the marriage; .

(2) the will does not provide for her as the surviving spouse;

(3) the omission was unintentional; and

(4) the decedent did not provide for the spouse with transfers outside of the will.[5]

*Id.* at 983 (citing S.C.Code Ann § 62–2–301(a)).

■ Green clearly passed the first of these hurdles. Martin's will was executed before his marriage to Marilyn. To determine whether the second condition

was met—whether Martin "provided for" Marilyn in the will—we look to:

(1) specific language in the will; or

(2) "sufficient extrinsic evidence that a bequest was made 'in contemplation of marriage.' "

---

**5.** The first two criteria are described as "qualifying" conditions and the latter two as "exclusionary" conditions. David E. Wagner, Article, *The South Carolina Probate Code's Omitted Spouse Statute and In Re Estate of Timmerman,* 50 S.C. L.Rev. 979, 984 (1999).

*See Miles v. Miles,* 312 S.C. 408, 440 S.E.2d 882 (1994) (holding a spouse has not been provided for in the absence of specific language in the will or extrinsic evidence a bequest was made in contemplation of marriage).

■ Green cites *Miles* in support of her proposition that Marilyn was not provided for by the will. In that case, Grady Miles executed a will on October 26, 1989, leaving Georgia Mae Hall his automobile and a life estate in his home. At the time Grady executed the will, Georgia had rejected numerous proposals of marriage from him. Georgia finally agreed to marry Grady a year after the will was executed. Grady and Georgia married and Grady died on September 21, 1991, without executing a new will. Georgia asserted she was an "omitted spouse" and filed an action claiming Grady's entire estate.

The Supreme Court held Grady's bequest and devise to Georgia prior to their marriage did not forestall application of the omitted spouse statute as there was no evidence the bequest and devise were made in contemplation of marriage. The Court ruled "a spouse has not been 'provided for' within the meaning of § 62-2-301 unless the decedent considered the surviving spouse in that capacity at the time the will was executed." *Id.* at 411, 440 S.E.2d at 883.

Green maintains Martin "could not have considered his special friend in the capacity of his wife—and he clearly did not." Green relies heavily on *Miles;* however, we find the facts of that case are distinguishable. The most obvious distinction between *Miles* and the instant case is that Martin's will and trust contain numerous, explicit references and bequests to Marilyn in her capacity as Martin's "wife" or "spouse." The face of the will refers to Martin's possible future marriage to Marilyn and the Trust Agreement specifically refers to Marilyn in her potential capacity as Martin's wife. In *Miles,* there was a total absence of any reference in the will to Georgia as a spouse.

Martin's attorney affirmed Martin executed the will and the accompanying trust agreement to care for Marilyn both in her capacity as "special friend" and as "wife." Marilyn was actively involved in the creation of Martin's estate plan. Marilyn accompanied Martin to Cothran's office and both Cottrell and

Marilyn consulted with Cothran about the plan. Martin "repeatedly said that he wanted Marilyn to marry him" and he did not want to change his estate plan after they married.

There is no evidence in the record Marilyn rejected Martin's proposal or that at the time he executed the will, Martin had any reason to doubt that Marilyn would become his wife in the future. Cothran opined Martin "made the estate plan provisions for [Marilyn] in contemplation of their eventual marriage."

The QTIP trust further distinguishes the facts of this case from those of *Miles*. Martin executed the trust documents on the same day he executed the will. The will refers to the trust. Trust C would only take effect in the event Martin and Marilyn married. There would have been no need for Martin to create a QTIP trust had he not contemplated marriage to Marilyn at the time he executed both the will and the trust. Viewing the above in the light most favorable to Marilyn, we conclude she failed to demonstrate a genuine issue of material fact existed that Martin did not provide for her in his will. *Cf. In re Estate of Norem*, 561 So.2d 434 (Fla.Dist.Ct.App.1990) (reversing summary judgment to wife seeking status as pretermitted spouse when wife made no showing trust provision for Norem's "intended spouse" was not made in contemplation of marriage).[6]

■ The exclusions also prohibit Marilyn from qualifying as an "omitted spouse" under the statute. Green failed to demonstrate a genuine issue of material fact existed that Marilyn was *unintentionally* omitted from Martin's will. Once again, we note the will plainly stated:

I have a special friend, MARILYN ANNE JACKSON, for whom I am making certain provisions in my estate plan (whether under this instrument or under any other instrument). Except as otherwise specifically provided, *I intend*

---

6. Florida, like South Carolina, has read a "contemplation of marriage" requirement into its omitted spouse statute. *See Miles v. Miles*, 312 S.C. 408, 440 S.E.2d 882 (1994); Mary Ellen Kazimer, *The Problem of the "Un–Omitted" Spouse under Section 2–301 of the Uniform Probate Code*, 52 U. Chi. L.Rev. 481, 492 (1985) ("The Florida Supreme Court, in [*Ganier's Estate v. Ganier's Estate*, 418 So.2d 256 (Fla.1982) ], read a contemplation-of-marriage requirement into its omitted-spouse statute, thus forbidding inquiry into the testator's post-execution intent.").

*for these provisions to apply for her benefit whether or not we should ever become husband and wife.*

(emphasis added). *Compare* Uniform Probate Code § 2–301(a)(2) (stating the surviving spouse is not entitled to an intestate share when "the will expresses the intention that it is to be effective notwithstanding any subsequent marriage").

The Revocable Trust Agreement contained a similar provision: "Except as otherwise specifically provided, *the Settlor intends for these provisions to apply for [Marilyn's] benefit whether or not they should ever become husband and wife.*" (emphasis added).

Cothran's affidavit provides further evidence Martin did not want to revise his estate plan after his marriage to Marilyn and that Martin wanted to keep his assets within the bloodline. "Marty wanted the trust for Marilyn designed to take advantage of this tax saving device after he and Marilyn were married, but did not want to have to change his estate plan after they were married." This indicated Martin's failure to devise more of his estate to Marilyn was *intentional.*

█ Green also failed to present any evidence creating a genuine issue of material fact that Marilyn was not provided for by transfers outside of Martin's will, namely the QTIP Trust. In *In Re Estate of Timmerman,* 331 S.C. 455, 502 S.E.2d 920 (Ct.App.1998), this Court examined the sufficiency of transfers outside of a will.

The Honorable George Bell Timmerman, former Circuit Court judge and governor, was married to Helen Timmerman for 45 years before her death in 1980. While married to Helen, Timmerman executed a will leaving his entire estate to her or to her sister, Margaret Dupre Long, if Helen predeceased him. The will additionally named several nieces and nephews as alternate beneficiaries.

In 1993, 82–year–old Timmerman married Ingrid Zimmer. Ingrid was over 30 years younger than Timmerman. Timmerman died less than two years later of injuries resulting from an auto accident. Although Timmerman consulted two estate-planning lawyers prior to his death, he never executed any of the documents they prepared for him.

Ingrid brought an action under the omitted spouse statute. The Probate Court held she was not an "omitted spouse" because of large transfers totaling $1,191,000 Timmerman made to her outside of the will.[7] This Court affirmed explaining "the sheer magnitude of the transfers from Timmerman to Ingrid is enough to support the probate court's finding that Timmerman did not intend for Ingrid to receive any benefits under the omitted spouse statute." *Timmerman*, 331 S.C. at 459, 502 S.E.2d at 922. As further support for the ruling, this Court noted that despite seeking estate planning advice, Timmerman "chose to leave his old will intact." *Id.* Martin similarly chose to leave his prior will and estate plan intact.

Green seeks to distinguish *Timmerman* by arguing Marilyn only received "nominal" property as Martin's special friend and no provisions were made for her after the marriage. The evidence in this case demonstrates that Martin did not want to change his will after marriage and that he provided for Marilyn by means of transfers outside the will. Additionally, on the same day he executed the will, Martin specifically created a QTIP trust for Marilyn in the capacity of his wife. This trust was above and beyond the bequests to Marilyn as "special friend."

## CONCLUSION

The Probate Code attempts to reconcile two competing goals: to effectuate the testator's intent and to provide for the surviving spouse. Martin's intent to provide for Marilyn with the QTIP Trust and other bequests is evident from the face of the will and trust agreement.

Because Green failed to demonstrate a genuine issue of material fact existed regarding Marilyn's qualification as an "omitted spouse" under the statute, the judgment of the Circuit Court is

**AFFIRMED.**

HUFF and SHULER, JJ., concur.

---

**7.** Timmerman added Ingrid as a survivor on his checking account; opened a joint account with her; reduced his retirement benefits so that Ingrid would receive $2,200 a month after his death; gave Ingrid $320,143; and insured she would receive $16,000 in life insurance benefits at his death.