556 S.E.2d 732

**Marvin BOONE, Appellant,**

v.

**SUNBELT NEWSPAPERS, INC., d/b/a The
Times and Democrat, Respondent.**

**No. 3410.**

Court of Appeals of South Carolina.

Heard Nov. 6, 2001.

Decided Nov. 19, 2001.

---

Jeffrey S. Holcombe and Clyde C. Dean, Jr., both of Dean Law Firm, of Orangeburg, for appellant.

Jay Bender, of Baker, Ravenel & Bender, of Columbia, for respondent.

ANDERSON, J.

This is a defamation action. Marvin Boone, a law enforcement officer, sued Sunbelt Newspapers, Inc., d/b/a *The Times and Democrat* ("Sunbelt"), alleging it published a newspaper article that contained false, misleading, and defamatory statements made about him by a local citizen. The trial court granted summary judgment in favor of Sunbelt, finding the article could not be understood as making false statements with a defamatory meaning about Boone and, in the alternative, the statements were privileged. Boone appeals. We affirm.

## FACTS/PROCEDURAL BACKGROUND

On July 4, 1988, 67–year–old Clyde Myers, a resident of Branchville, drove a truck loaded with drums containing 500 gallons of gasoline through the doors of the Orangeburg–Calhoun Law Enforcement Complex ("LEC"), flooded the floor with gasoline, ignited it, and then engaged in a twenty-minute gun battle that wounded four officers. The LEC was nearly destroyed in the attack. Myers had purchased a bulletproof vest, steel helmet, and gas mask in preparation for the incident.[1] Charges against Myers were *nolle prossed* in May 1989 when he was declared unable to assist in his own defense. In July 1997, Myers, then 76–years–old, was re-indicted for the attack by the Orangeburg County grand jury.

This litigation arises out of Sunbelt's publication of an article in the August 3, 1997, edition of its newspaper, *The Times and Democrat,* in which Sunbelt employees interviewed Myers and published his account of the events that precipitated the attack and explanation for attempting to burn down the

---

1. Myers was also injured. He claimed his thumb was shot off so he "couldn't hold the gun no more," and his foot had to be amputated after it became infected from his injuries. Myers was hospitalized and later spent time at the South Carolina Department of Mental Health. Myers stated he was so medicated that he "didn't know nothing for about two or three years."

LEC.[2] The publication coincided with the re-indictment of Myers and was headlined on page 1A as follows:

The headline on the jump page (at page 10A) proclaimed:

### Myers' hate aimed at one deputy but another deputy says he made arrest

The article stated, "For nine years, Clyde Burdell Myers, 76, has been mum about why it happened. On Thursday, he told his story to The Times and Democrat."

Myers' account of the events described a dispute in 1988 with the Orangeburg County Council over a road adjoining his property and Myers' belief that he had been treated improperly when arrested for malicious injury to county property in connection with the road dispute. Myers stated his attack on the LEC was in retaliation for this arrest, and that he was "standing up for [his] civil rights." The article declared:

*Ironically, the one man Myers continues to hate to this day for hurting him during that arrest isn't even the man who arrested him.*

(emphasis added).

According to Myers, when County Council did not respond to a 10 day deadline he had imposed for a response to his inquiry about who owned a local road, Myers proceeded on the morning of the 10th day to plow up half the road adjacent to his property and place barricades on each end of the road. Myers then drove to a local store to purchase "No Trespassing" signs. Upon his return, he encountered two Orangeburg County sheriff's deputies on the highway. Myers got out of his vehicle, took some tacks and a claw hammer, and began placing the signs on the barricades. The article stated:

He claims it was then-Deputy Marvin Boone who told him he had an arrest warrant for him for damaging the county roadway.

Myers asserted Boone placed the handcuffs too tightly on his left wrist and repeatedly "jerked down" on the handcuffs, injuring his hand. The article explained Myers' apparent mistaken identification of Boone as the arresting officer:

---

2. It was accompanied by another article, "Grand jury revives case against Myers."

### Arrest sparked hatred for wrong officer

Claiming that the deputy "treated me like a mad dog" during the arrest, Myers said he developed a hatred for the officer that set the wheels of revenge in motion—a hatred so intense that Myers admitted he had even considered crashing a truck loaded with gasoline into Boone's home.

"Marvin Boone was the main one. In my mind one time I had sort of halfway planned [on] attacking his home in Rowesville, but I overruled attacking his home and family and children, because I didn't know how many children were in the neighborhood," Myers said. "If I'd of run that sucker up against that house and torched it like I did that complex, a lot of people would have been hurt."

That revelation became even more chilling Friday when Boone, the son of then-Sheriff Vance Boone who is now a lance corporal in the State Transport Police, said he was not the officer who arrested Myers—insisting he doesn't remember ever meeting the [sic] Myers, much less arresting him.

The Orangeburg County Sheriff's Office backed up Boone's assertion Friday, stating it was former deputy Johnny Haddock who, along with Larry Williams, arrested Myers for damaging the county roadway.

"Yeah. Larry and I arrested him for damaging county property," Haddock said Saturday. "He claimed we broke his wrist and later filed a civil rights complaint with the FBI. FBI agent Bill Daniels came down to investigate the complaint. After checking into it, Daniels cleared us of any wrongdoing. He told me it appeared Myers made the complaint just out of spite."

. . . .

[Haddock] said he never jerked down on the handcuffs as Myers claimed.

"Myers was 67 years old at the time. We didn't need to use any force, especially having a fella Larry Williams' size there. He didn't try to fight us during the arrest. He just stood there with that off-in-the-west look," Haddock said.

. . . .

"I've always felt like when he came up there and burned that complex he came looking for me and Larry," Haddock said.

Why Myers continues to insist it was Marvin Boone who arrested him during the road incident is a mystery, Haddock said.

"Marvin and I looked enough alike, I reckon. We were both the same height and size and both of us had dark hair. I had a moustache and Marvin didn't," he said. "But Myers' bread ain't exactly done, either. That's got a lot to do with it."

The article stated when Sunbelt's reporters confronted Myers with evidence that Boone was not the arresting officer and asked if it were possible he had confused Boone with Haddock all these years, Myers insisted he knew without a doubt the arresting officer was Boone. Myers contended the reason "[his] arm was about tore off" was because Boone was upset with him for reporting to the FBI an illegal drug operation from which Myers said law officers were profiting. Myers maintained he had reported to the FBI that a patrol car regularly visited a nearby home and the deputy would "exchange something" with the occupant, and he was suspicious. The article stated: "Myers said he would not identify by name the officer who was going to the residence, but he insinuated Boone and others in the sheriff's office may have been involved."

The paper contacted Boone for his response to Myers' allegations and duly reported that Boone found them "groundless":

Boone, saying he cannot talk further about Myers because he may be called to testify if Myers is brought to trial, did say that such an allegation about drugs is completely groundless. "I never have done anything like that and I never would."

Finally, the article noted: "Adding a final ironic twist to his story, Myers said the letter he had been waiting for from [the Orangeburg County Attorney] informing him who owned Sub Road actually did arrive on the 10th day of the 10–day deadline he gave the county. The problem was it arrived at 3 p.m. that afternoon, after he had plowed up the road." When

asked if he had any regrets about the incident, Myers said, "No," and asserted, "Ain't nobody going to deny me of my civil rights. I'd die first ... anytime, anywhere!" The article concluded with Myers' explanation that he "just wanted the public to know what happened."

Boone brought this action for libel against Sunbelt in 1998, alleging he was a public official and Sunbelt published the allegations concerning the alleged use of excessive force and his purported illegal drug activity with actual malice. Boone averred the statements were "false, defamatory, and beyond any qualified privilege." He sought both actual and punitive damages, claiming the article injured his reputation and caused him severe physical and mental suffering.

The trial court granted Sunbelt's motion for summary judgment, ruling the article could not reasonably be read to make a false statement of fact with a defamatory meaning of and concerning Boone. In the alternative, the court concluded as a matter of law that, even if the statements were false, they were privileged under the "neutral reportage doctrine" because they concerned a matter of public interest. Boone appeals.

## STANDARD OF REVIEW

Summary judgment is appropriate when it is clear there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), SCRCP; *Bayle v. South Carolina Dep't of Transp.*, 344 S.C. 115, 542 S.E.2d 736 (Ct.App.2001), *cert. denied; Olson v. Faculty House of Carolina, Inc.*, 344 S.C. 194, 544 S.E.2d 38 (Ct.App. 2001), *cert. granted; Baird v. Charleston County*, 333 S.C. 519, 511 S.E.2d 69 (1999); *Vermeer Carolina's, Inc. v. Wood/Chuck Chipper Corp.*, 336 S.C. 53, 518 S.E.2d 301 (Ct.App. 1999); *see also Green v. Cottrell*, 346 S.C. 53, 550 S.E.2d 324 (Ct.App.2001), *cert. pending* (stating that a trial court should grant motion for summary judgment when pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and moving party is entitled to judgment as matter of law).

Under Rule 56(c), the party seeking summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact. *Carolina Alliance for Fair Employment v. South Carolina Dep't of Labor, Licensing, and Regulation,* 337 S.C. 476, 523 S.E.2d 795 (Ct.App.1999). Once the moving party meets the initial burden of showing an absence of evidentiary support for the opponent's case, the opponent cannot simply rest on mere allegations or denials contained in the pleadings; rather, the non-moving party must come forward with specific facts showing there is a genuine issue for trial. Rule 56(e), SCRCP; *Peterson v. West Am. Ins. Co.,* 336 S.C. 89, 518 S.E.2d 608 (Ct.App.1999). In determining whether any triable issues of fact exist, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the party opposing summary judgment. *Summer v. Carpenter,* 328 S.C. 36, 492 S.E.2d 55 (1997); *Pye v. Aycock,* 325 S.C. 426, 480 S.E.2d 455 (Ct.App.1997).

"The plain language of Rule 56(c), SCRCP, mandates the entry of summary judgment, after adequate time for discovery against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Carolina Alliance for Fair Employment,* 337 S.C. at 485, 523 S.E.2d at 800.

On appeal, this Court reviews the grant of summary judgment using the same standard applied by the trial court. *Bray v. Marathon Corp.,* 347 S.C. 189, 553 S.E.2d 477 (2001); *see also Estate of Cantrell v. Green,* 302 S.C. 557, 559, 397 S.E.2d 777, 778 (Ct.App.1990) ("On appeal from summary judgment, the reviewing court must consider the facts and inferences in the light most favorable to the nonmoving party. The judgment may be affirmed only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.") (citations omitted).

## *LAW/ANALYSIS*

### I. Absence of False Statement of Fact and Defamatory Meaning

Boone contends the trial court erred in granting summary judgment to Sunbelt on the basis the article, when considered

as a whole, did not make false statements about him and was not defamatory as a matter of law. We disagree.

■ "The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff." *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 334 S.C. 469, 484, 514 S.E.2d 126, 133 (1999) (citation omitted).

■ The elements of a cause of action for defamation include: (1) a false and defamatory statement concerning another, (2) an unprivileged publication to a third party, (3) fault on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 506 S.E.2d 497 (1998) (*Holtzscheiter II*) (Toal, J., concurring), *recited in Murray v. Holnam, Inc.*, 344 S.C. 129, 542 S.E.2d 743 (Ct. App.2001).

> In addition to being defamatory, the statement must be false. Under the common law, a defamatory communication was presumed to be false. However, truth could be asserted as an affirmative defense. The Supreme Court's holding in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768–69, 106 S.Ct. 1558, 1559, 89 L.Ed.2d 783, 787 (1986), modified the common law rule: "[A]t least where a newspaper publishes speech of public concern, a private figure plaintiff cannot recover damages without also showing that the statements at issue are false." Thus, an initial question that must be answered is whether the speech is of public concern. If it is a matter of public concern (at least where a media defendant is involved), the plaintiff must also prove its falsity. If it is a matter of private concern, the plaintiff does not have to prove falsity. "The publisher may avoid liability if it successfully proves the statement is true (i.e. the affirmative defense of truth is available to the publisher in any type of case)." Whether a communication is reasonably capable of conveying a defamatory meaning is a question of law for the trial court to determine.

*Fleming v. Rose*, 338 S.C. 524, 533–34, 526 S.E.2d 732, 737 (Ct.App.2000), *cert. granted* (citations omitted).

■ "In defamation actions involving a 'public official' or 'public figure,' the plaintiff must [also] prove the statement

was made with 'actual malice,' i.e., with either knowledge that it was false or reckless disregard for its truth." *Elder v. Gaffney Ledger*, 341 S.C. 108, 113, 533 S.E.2d 899, 901 (2000) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).[3] "Whether the evidence is sufficient to support a finding of actual malice is a question of law [for the trial court]." *Id.* at 113, 533 S.E.2d at 901–02.

 Malice must be shown by clear and convincing evidence. *Miller v. City of West Columbia*, 322 S.C. 224, 228, 471 S.E.2d 683, 685 (1996) ("To recover on a claim for defamation, the Constitutional actual malice standard requires a public official to prove by clear and convincing evidence that the defamatory falsehood was made with the knowledge of its falsity or with reckless disregard for its truth.") (citations omitted). Constitutional actual malice required in defamation actions involving public officials is distinguishable from common law malice, which refers to feelings of ill-will, spite, or desire to injure. *Sanders v. Prince*, 304 S.C. 236, 403 S.E.2d 640 (1991).

As our Supreme Court recently reiterated in *George v. Fabri*, 345 S.C. 440, 548 S.E.2d 868 (2001):

The constitutional guarantee of free speech requires that a public official or public figure must prove a defamatory statement was made "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." At trial, the plaintiff must prove actual malice by clear and convincing evidence.

*Id.* at 451, 548 S.E.2d at 874 (citations omitted).

 "In a defamation action, the defendant may assert the affirmative defense of conditional or qualified privilege.

---

**3.** The parties agree that, in his capacity as a law enforcement officer, Boone is a public official for purposes of this defamation action. *See McClain v. Arnold*, 275 S.C. 282, 270 S.E.2d 124 (1980) (joining the majority of jurisdictions in holding that a police officer is a public official for defamation actions, thereby requiring the plaintiff's proof of actual malice); *see also Botchie v. O'Dowd*, 315 S.C. 126, 432 S.E.2d 458 (1993) (applying actual malice standard to deputy sheriff's defamation action); *Gause v. Doe*, 317 S.C. 39, 451 S.E.2d 408 (Ct.App.1994) (public officials such as police officers must establish actual malice).

Under this defense, one who publishes defamatory matter concerning another is not liable for the publication if (1) the matter is published upon an occasion that makes it conditionally privileged, and (2) the privilege is not abused." *Swinton Creek Nursery v. Edisto Farm Credit,* 334 S.C. 469, 484, 514 S.E.2d 126, 134 (1999) (citations omitted). "In general, the question whether an occasion gives rise to a qualified or conditional privilege is one of law for the court." *Murray v. Holnam, Inc.,* 344 S.C. 129, 140, 542 S.E.2d 743, 749 (Ct.App. 2001). "However, the question whether the privilege has been abused is one for the jury." *Id.*

■ "[T]he intent and meaning of an alleged defamatory statement must be gathered not only from the words singled out as libelous, but from the context; all of the parts of the publication must be considered in order to ascertain the true meaning, and words are not to be given a meaning other than that which the context would show them to have." *Jones v. Garner,* 250 S.C. 479, 485, 158 S.E.2d 909, 912 (1968) (citation omitted).

■ "It is the trial court's function to determine initially whether a statement is susceptible of having a defamatory meaning." *White v. Wilkerson,* 328 S.C. 179, 183, 493 S.E.2d 345, 347 (1997) (citation omitted). A motion for summary judgment should be granted if the court determines the publication is incapable of any reasonable construction that will render the words defamatory. *Id.* at 183–84, 493 S.E.2d at 347.

■ In the current appeal, the trial court found when the article was considered in its entirety, "it is clear as a matter of law that the article does not have a defamatory meaning with respect to [Boone]." The court observed: "Since the allegations by Myers against [Boone] hinged entirely on the accuracy of Myers' identification of [Boone] as his arresting officer, and the article refuted Myers' identification of [Boone], the article in its entirety rendered innocuous the allegations by Myers against [Boone]." The court concluded: "The only reasonable interpretation of the article complained of by the plaintiff is that it does not state actual facts with respect to the plaintiff as the person identified by Myers as his arresting

officer or the person involved in suspicious activity. Myers' identification of plaintiff was refuted throughout the article."

Boone argues the trial court erred in ruling this case was distinguishable from *Stevens v. Sun Publishing Company,* 270 S.C. 65, 240 S.E.2d 812 (1978). Sun Publishing published two newspapers containing allegedly libelous articles regarding the plaintiff, a state senator. The article implied the plaintiff was being manipulated by his brother and incorrectly stated he was being sued for abuse of political power. Sun Publishing appealed the denial of its JNOV motion, asserting the articles were not defamatory, but the Supreme Court affirmed a verdict in favor of the plaintiff. The Court found the articles contained blatantly false statements and opinions by a biased informant that implied improper conduct by a public official.

Boone asserts that, as in *Stevens,* the informant in this case, Myers, was clearly biased against him and the newspaper was aware of the bias and yet reported blatantly false statements about him. We disagree.

The trial court stated "*Stevens* is fully distinguishable from the case at hand. In *Stevens,* the newspaper adopted as the basis of its news story statements which it knew to be from a biased source. The paper made no additional investigation of the potential falsity of the information from the source, and the reporter acknowledged an animus against the plaintiff. None of these factors have been shown to exist in this case." We agree with the trial court's analysis in this regard and find *Stevens* does not afford a basis for relief.[4]

In presenting Myers' explanation of his actions some nine years before, the article clearly stated in the text at the outset: "Ironically, the one man Myers continues to hate to this day for hurting him during that arrest isn't even the man who arrested him." Further, the article's heading on the article's jump page on page 10A stated: "Myers' hate aimed at

---

4. Further, in *Stevens,* the Court focused on the issue of actual malice as the statements were shown to be false. In the current appeal, because we find the disputed statements were not false statements of fact susceptible of a defamatory meaning of and concerning Boone, we need not address whether the statements were made with actual malice. *Cf. Botchie v. O'Dowd,* 315 S.C. 126, 130, 432 S.E.2d 458, 460–61 (1993) (stating "[w]e need not determine the truthfulness of the statement as we find in the record no evidence that it was made with malice").

one deputy but another deputy says he made arrest"; a subheading in the text also proclaimed: "Arrest sparked hatred for wrong officer." *See Ross v. Columbia Newspapers, Inc.,* 266 S.C. 75, 81, 221 S.E.2d 770, 773 (1976) ("As a general rule, both the headline and the article following it must be considered as one document in determining whether it is defamatory.") (citations omitted).

The article is a first-person account from a citizen who took extreme steps to seek revenge against a law enforcement officer he believed had mistreated him during an arrest. A review of the article reveals that Myers was mistaken in his identification, thus casting doubt on his explanation of the events. The article reported Boone's statement that he was not the arresting officer; moreover, the newspaper identified the deputies who actually made the arrest, Haddock and Williams, and included its interview with Haddock, who acknowledged he was in fact one of the arresting officers. Contrary to the circumstances in *Stevens,* Sunbelt's newspaper did not adopt the version of events propounded by Myers.

In addition, the article included background information about Myers' treatment for emotional problems, which further cast doubt on any identification of Boone. For example, the article noted Myers had been treated at the South Carolina Department of Mental Health after this incident and included Myers' description of his purported instructions upon discharge: "He [Myers] said a doctor at the mental institution told him and his wife that 'I cannot come to Orangeburg County again. I can go anywhere else in the state or nation but not Orangeburg County.'" A photograph of Myers chained to a chair accompanied the article and the caption read: "Clyde Myers, now 76, had a history of protest against county government. In 1985, amid warnings that he would be ejected from County Council meetings, Myers chained himself to a chair in council chambers."

Thus, we agree with the trial court that, when considering the article as a whole, it could not reasonably be interpreted as stating false statements with a defamatory meaning of and concerning Boone. *See, e.g., Early v. Toledo Blade,* 130 Ohio App.3d 302, 720 N.E.2d 107 (1998) (stating the trial court must read the statements at issue in the context of the entire article

to determine whether a reader would interpret them as defamatory and finding a police officer plaintiff had failed to establish a newspaper article regarding police brutality and misconduct was personally defamatory); *cf. Sweeney v. Sengstacke Enters., Inc.*, 180 Ill.App.3d 1044, 129 Ill.Dec. 773, 536 N.E.2d 823, 826 (1989) (holding newspaper's article reporting that police officer had stated he and others planned to kill the city mayor was not capable of an innocent construction so as to be nonactionable, whether read alone or in the context of the entire article, the court rejecting the defendants' assertion that the remainder of the article gave it a different, innocent meaning, and finding "[t]he entire focus of the article is the threat by a police officer on the life of the mayor" and noting the headline announced "policeman threatened mayor"). Accordingly, we affirm the trial court's grant of summary judgment to Sunbelt based on the court's finding the newspaper article did not contain false statements with a defamatory meaning of and concerning Boone.

## II. Neutral Reportage Privilege

Boone next challenges the trial court's alternative finding that the statements published by Sunbelt, even if false, were not actionable because they were privileged.

The trial court, citing *Sunshine Sportswear & Electronics, Inc. v. WSOC Television, Inc.*, 738 F.Supp. 1499 (D.S.C.1989), alternatively found Sunbelt was insulated from liability under the "neutral reportage doctrine." The court explained:

> In recognition of the protection for criticism of public officials as a protected practice in a democracy, the reporting of the criticism is also protected under the doctrine of "neutral reportage." This doctrine insulated from liability the reporting of defamatory statements made against public figures when the republication does not adopt, espouse or concur in the charges.

The trial court further found that, "rather than rely[ing] on this protection alone, [Sunbelt] went beyond the reporting of the charges and exposed the misidentification of the plaintiff by Myers, and thereby established that [Boone] could not have been guilty of the misconduct alleged by Myers."

Boone contends the trial court erred in finding the neutral reportage privilege and its exposure of Myers's misidentification insulated Sunbelt from liability. Boone contends there is a factual issue regarding whether Sunbelt "accurately and disinterestingly" reported the statements Myers made against him. Boone asserts: "Viewing the article as a whole, a jury could find the manner in which the Defendant reported Myers' accusations against Plaintiff left a reasonable reader with the impression that the story Myers told had some validity."

The trial court's reliance on the neutral reportage privilege assumes the challenged statements were false. It is a doctrine that provides an exception to liability for what could otherwise be a defamatory statement. Since we have affirmed the trial court's grant of summary judgment to Sunbelt based on its finding the newspaper article did not contain false and defamatory statements about the plaintiff, we need not reach this alternative ground in support of summary judgment. *See, e.g., Ross,* 266 S.C. at 80, 221 S.E.2d at 772 ("Since we agree with the trial judge's determination that the [newspaper] articles were clearly not false or defamatory, we need not reach the question of qualified privilege."); *Fuller–Ahrens Partnership v. S.C. Dep't of Highways & Pub. Transp.,* 311 S.C. 177, 427 S.E.2d 920 (Ct.App.1993) (holding where an appellate court affirms trial court's grant of summary judgment on a particular ground, the appellate court need not discuss the remaining grounds); *Weeks v. McMillan,* 291 S.C. 287, 292, 353 S.E.2d 289, 292 (Ct.App.1987) ("Where a decision is based on alternative grounds, either of which independent of the other is sufficient to support it, the decision will not be reversed even if one of the grounds is erroneous.") (citation omitted).

## CONCLUSION

We hold that a cause of action for defamation fails when there is an absence of false statement and defamatory meaning. Based on the foregoing, the trial court's order granting summary judgment to Sunbelt is

**AFFIRMED.**

CONNOR and HOWARD, JJ., concur.