# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Amy Garrard and Lee Garrard, Guardians Ad Litem for R.C.G., A Minor; and Dean Frailey and Kathryn Frailey, Guardians Ad Litem for C.F., A Minor, Richard Nelson and Cheryl Nelson, Guardians Ad Litem for D.G.N., A Minor; Adam Olsen Ackerman; and A.E.P., III, Plaintiffs,

v.

Charleston County School District, Kevin Clayton, Axxis Consulting Company, and Jones Street Publishers, LLC, Defendants,

And

Eugene H. Walpole, Plaintiff,

v.

Charleston County School District, Kevin Clayton, Axxis Consulting Company, and Jones Street Publishers, LLC, Defendants,

Of Whom Eugene H. Walpole, Amy Garrard and Lee Garrard, Guardians Ad Litem for R.C.G., A Minor; and Dean Frailey and Kathryn Frailey, Guardians Ad Litem for C.F., A Minor, Richard Nelson and Cheryl Nelson, Guardians Ad Litem for D.G.N., A Minor; Adam Olsen Ackerman; and A.E.P., III, are the Appellants,

And

Of Which Jones Street Publishers, LLC, is the Respondent.

Appellate Case No. 2016-002525

Appeal From Charleston County
Jean H. Toal, Circuit Court Judge

Opinion No. 5691
Heard April 1, 2019 – Filed November 6, 2019

**AFFIRMED**

John E. Parker and William F. Barnes, III, of Peters,
Murduagh, Parker, Eltzroth, & Detrick, P.A., of
Hampton, for Appellants.

Wallace K. Lightsey and Meliah Bowers Jefferson, of
Wyche, PA, of Greenville, for Respondent.

**GEATHERS, J.:** In this defamation action, Appellants—six members of the 2014-2015 Academic Magnet High School (AMHS) football team and their head coach, Eugene Walpole (Coach Walpole)—appeal the circuit court's order granting summary judgment to Respondent Jones Street Publishers. Appellants contend the circuit court erred in (1) finding the statements of fact in certain articles published by Jones Street Publishers are protected by the fair report privilege, (2) finding the opinions expressed in the articles are not actionable, (3) finding Appellants have not shown proof of injury to reputation, (4) finding the alleged defamatory statements were not "of and concerning" the students, and (5) finding Coach Walpole has not shown that Jones Street Publishers acted with actual malice. We affirm.

## FACTS/ PROCEDURAL HISTORY

Appellants initiated this defamation action against Jones Street Publishers following its publication of two opinion editorials in the *Charleston City Paper* (*City Paper*)[1] concerning a post-game watermelon ritual performed by the AMHS football team. News regarding the watermelon ritual began on October 21, 2014, when the

---

[1] Jones Street Publishers owns and publishes the *City Paper*.

superintendent of Charleston County School District (the School District), Dr. Nancy McGinley, issued a press release stating,

> There was an allegation related to inappropriate post game celebrations by the Academic Magnet High School (AMHS) Football Team. An investigation was conducted and, as a result of the investigation, the head football coach will no longer be serving as a coach for Charleston County School District.

Following this press release, Superintendent McGinley held a press conference in which she described the post-game ritual that prompted the investigation. Superintendent McGinley stated that "allegations" were brought to her attention by one of the School District's board members who indicated AMHS's football team was practicing a watermelon ritual that involved students making "monkey sounds" as part of their post-game celebration. She expressed that the board member was concerned about the "racial stereotypes related to this type of ritual." Superintendent McGinley contacted AMHS's principal to investigate the matter. The principal indicated that "the coaches were aware of the ritual following the victories[,] but they did not observe any cultural insensitivities." The principal reported back to Superintendent McGinley that it was an "innocent ritual." However, Superintendent McGinley decided that further investigation was necessary because the board member stated that the football team engaged in a "tribal-like chant that [was] animalistic or monkey-like."

Superintendent McGinley asked the School District's diversity consultant, Kevin Clayton and Associate Superintendent Louis Martin to conduct the investigation. Mr. Clayton and Mr. Martin interviewed the students on the football team and the coaches. The investigation revealed that "players would gather in a circle and smash the watermelon while others were either standing in a group or locking arms and making chanting sounds that were described as 'Ooo ooo ooo,' and several players demonstrated the motion." Superintendent McGinley stated the AMHS team named the watermelons "Bonds Wilson"[2] and drew a face on each watermelon "that could be considered a caricature." A copy of the caricature that

---

[2] Bonds Wilson is the name of a formerly segregated African-American school that was located at the campus where AMHS is now located and was named in honor of two prominent African-American educators from Charleston.

was drawn on the watermelons was shown at the press conference.[3]  Superintendent McGinley concluded the press conference by stating that it was "our conclusion that the accountability lies with the adults" and that the Charleston County School District (the School District) had "taken action to relieve the head coach of his responsibilities."  No students were named during the press conference.

After the press conference, several news media outlets ranging from national publications to the AMHS's newspaper reported on the firing of Coach Walpole, and numerous commentators expressed their opinions concerning the post-game ritual.

*City Paper*'s editor, Chris Haire, watched Superintendent McGinley's press conference by a live television broadcast from the School District's public hearing room.  After viewing the press conference, Mr. Haire wrote an opinion editorial about the events described entitled, "Melongate: Big toothy grins, watermelons, and monkey sounds don't mix," which was published in the *City Paper* on October 21, 2014.  The article, in its entirety, provided,

> Today, Charleston was consumed by one story and one story only: the removal of Academic Magnet football coach Bud Walpole amid allegations that his players more or less behaved like racist douchebags.  And if there's one lesson to be learned from all of this[,] it's this: big toothy grins, watermelons, and monkey noises don't mix.  Any sensible person can see that.
>
> Apparently not.  And apparently not the coaching staff and the players on the Academic Magnet Raptors.
>
> Somewhere along the way in this year's unexpectedly successful season, the Raptors took a liking to buying watermelons before their games.  They apparently drew a face on it each time—a big toothy, grinning face.  The first time the watermelon was named Junior.  The next time it was Bonds Wilson, the name of the campus the AMHS shares with School of the Arts.  That name stuck.
>
> But here's where the things get even worse.  At the close of each game, the players smashed the watermelon on the

---

[3] The picture was drawn by the same football player who drew the faces on the watermelons during most of the post-game celebrations.

ground while reportedly making the monkey-like sounds of 'ooh ooh ooh ooh.' Apparently, the players did this after four or five games, each time evidently after the largely white Raptor squad beat one of their opponents, each one largely an African-American team. Parents of players on one of the opposing teams reportedly brought this to the attention of African-American Board member Michael Miller last week.

That the coaching staff of the Academic Magnet Raptors and none of its players, including at least one African-American, didn't see the trouble with this toxic combination of monkey sounds, toothy grins, and watermelons is at best baffling and at worst indicative of the casual acceptance of racism in Charleston today, even among the best and brightest that the county has to offer. After all, AMHS is not only the No. 1 ranked school in the state, it's one of the tops in the nation[].

Seriously, did everyone at AMHS forget the last 100 years of American history? Did they forget about blackface, Buckwheat, and *Birth of a Nation*? Did they forget about minstrel shows? Did they forget about Coons Chicken, lawn jockeys, golliwogs, and the like? Apparently so. I don't know about you, but I think it's time to reconsider Academic Magnet's rankings because clearly they are producing nothing more than grade-A dumbas[***].

Even more troubling is the degree to which Raptor Nation has circled the wagons around Walpole and the team. Frankly, this has nothing to do with the fact that the coach is by all accounts a good man. Walpole's merits are meaningless.

The point is that an entire team of players thought it was OK to draw a grinning face on a watermelon, smash it on the ground each time they beat a largely black team, and make monkey noises—and no one apparently told them to stop.

No one said, "Hey guys, I know not a single one of you has a racist bone in your body, you know, because that's a bad thing, and well, you're an Academic Magnet kid, and you come from a good middle-class white family and you're going to college, and there's no way in hell you'd, you know, draw a racist caricature on a watermelon and make monkey noises and do it fully aware of, like, what all that stuff means, because if you did, knowing all that stuff, then yikes, people might start thinking you're racists. Hell, I'd think you're a racist, and, well, I just don't know if I can deal with the fact that Charleston's best and brightest students are racist douchebags. I mean, it's just a joke right? Right?"

Actually, it's not. It's the sad truth about life here in Charleston, S.C. today.

In a reversal, Superintendent McGinley issued a press statement on October 22, 2014 indicating she was reinstating Coach Walpole as head coach and that he would resume his coaching duties on October 23, 2014. Shortly thereafter, the Charleston County School Board announced the resignation of Superintendent McGinley.[4] Following this announcement, Mr. Haire wrote a second article entitled, "Mob Rules: School district forces out superintendent who fired coach who condoned racist ritual." This article was published in the *City Paper* on November 5, 2014.

Later that month, six members of the AMHS football team filed a defamation complaint against Jones Street Publishers, the School District, Kevin Clayton, and Axxis Consulting Company.[5] In December 2014, Coach Walpole also filed a defamation complaint against the same defendants. Both cases were consolidated on October 23, 2015.[6]

Appellants alleged the two opinion editorials contained defamatory statements. Specifically, as to the article "Melongate," Appellants argued the

---

[4] The record is unclear regarding the reason for Superintendent McGinley's resignation.

[5] Mr. Clayton was an employee of Axxis Consulting Company.

[6] This appeal solely concerns Jones Street Publishers. The record does not contain any details regarding the outcome of Appellants' claims against the other defendants.

reference to the students as "racist douchebags" was defamatory, and as to the article "Mob Rules," Appellants argued the title of the article itself was defamatory because it stated Coach Walpole "condoned a racist act." Appellants also alleged Jones Street Publishers damaged their reputations "by publishing articles that accused [Appellants] of participating in racially-motivated post-game celebration rituals." Essentially, Appellants argued the articles implied that the football team and the coach were racist.

Jones Street Publishers moved for summary judgment, and a hearing was held on October 11, 2016. Jones Street Publishers argued the following facts were reported by the *City Paper* in its publications: "the fact that watermelons were smashed as part of this ritual, that there was a face drawn on them, that there was a caricature, that monkey sounds were made, [that] the ritual took place and that a watermelon was named Bonds Wilson." Jones Street Publishers maintained that these facts were protected by the fair report privilege because "all of the facts came from the press conference that the Charleston County School District held to report its finding of its investigation of the ritual." As for the remaining content in the articles, Jones Street Publishers argued that "[the] *City Paper* gave its editorial view of those facts, its view of what had happened." Specifically, Jones Street Publishers indicated the following to be its editorial viewpoint of those facts:

> That the football players had behaved like racist douchebags, that if they did not realize that their actions would be perceived as racially offensive, that that was indicative of the casual acceptance of racism in Charleston today, that the school had not taught its students about the history of the watermelon trope, and it was turning out a bunch of grade A dumbas[***] and not the best and brightest and that this was a racist ritual, a racist behavior, on the part of the people [who] participated in it.

Jones Street Publishers argued the opinions were protected by the First Amendment.[7] Additionally, Jones Street Publishers produced affidavits from two of its editors indicating that they had no reason to doubt the truth of the statements made by Superintendent McGinley at the press conference.

Appellants opposed Jones Street Publishers' motion for summary judgment, arguing Jones Street Publishers acted with actual malice by "labeling" the students

---

[7] U.S. Const. amend. I.

and coach "as racist douchebags without any investigation, without any evidence, without anything to come to that conclusion . . . ." Appellants argued Jones Street Publishers was negligent "because they made no effort to find the truth," and "made up the fact that the students and coaches are racist douchebags." Instead, Appellants asserted the players' motives were not racially based but more akin to the movie Castaway where Tom Hanks drew a face on a volleyball and named it "Wilson;" here, the football players drew a face on the watermelon and named it "Bonds-Wilson." Appellants argued the testimony in their case would prove "their intentions."

First, the circuit court found that all of the factual statements in the articles were "accurate reproductions of comments made publicly by School District officials, and thus [were] protected by the fair report privilege." Next, the circuit court found the remaining statements in the articles were "merely expressions of the writer's opinions and ideas on a matter of public concern. Under established First Amendment jurisprudence, Jones Street [Publishers] cannot be held liable for such statements." The circuit court stressed that the "subject of the Jones Street publications addressed a matter of public concern." To this point, the circuit court stated,

> The AMHS football team's ritual, the School District's investigation into the AMHS football team's ritual, and Coach Walpole's removal as head coach of the team were subjects of great interest to the Charleston Community and garnered widespread coverage from media outlets both locally and throughout the United States. The controversy involved allegations of racial insensitivity in a city steeped with a historical legacy of racial tension. When viewing the record as a whole, there is little doubt that the speech at issue in this case was addressed to a matter of public concern.

The court indicated that it was "settled law that expressions of opinion on matters of public concern are immune from liability for defamation." The court noted that once the factual statements in the articles that summarized the statements made by the School District are removed, none of the remaining statements "assert[] any verifiable, objectively provable fact. They are expressions of the editorial writer's ideas and opinions, using rhetorical hyperbole to emphasize his views." The court further stated,

Whether the football players acted like "racist douchebags," whether the team's failure to perceive the negative racial connotations of their actions is "indicative of the casual acceptance of racism in Charleston today," whether the watermelon ritual was an act that "any sensible outside observer" would "perceive[] as racist," or an example of "inadvertently . . . hurtful racially offensive behavior"—these are all statements on which different persons could have different views and sentiments. In fact, many people did express different views on the matter[,] and it was a highly contested issue for the School District. None of the statements, as expressed in the Jones Street publications, are statements of fact that can be objectively proved or disproved in a court of law.

Lastly, the circuit court found that Appellants failed to produce any evidence of either special damages or general damages arising from an injury to their reputations as a result of the *City Paper* publications. Specifically, the court noted that the alleged defamatory statements were not "'of and concerning' [Appellants], in that they refer to the entire football team and not to any of [Appellants] individually." In regard to Coach Walpole, the court found that he was a public official and noted that "public school teachers and athletic coaches have been held to be public officials." Therefore, Coach Walpole was required to prove that Jones Street Publishers acted with actual malice. The circuit court determined that Coach Walpole failed to prove actual malice. The court noted that there was evidence from Jones Street Publishers' editors indicating that "they had no reason to doubt that the reported information was anything other than completely true and accurate." The court found that Coach Walpole failed to "direct the [c]ourt to a single line of testimony in the depositions or any passage of the publications that constitutes evidence that anyone at Jones Street [Publishers] knew of any false statement in the editorials or articles or in fact entertained serious doubts as to the truthfulness of them." The circuit court granted Jones Street Publishers' motion for summary judgment and this appeal followed.

## ISSUES ON APPEAL

1. Did the circuit court err in finding the statements of fact in the articles were protected by the fair report privilege?

2.  Did the circuit court err in finding the opinions expressed in the articles were not actionable?

3.  Did the circuit court err in finding Appellants did not show proof of injury to reputation?

4.  Did the circuit court err in finding the alleged defamatory statements were not "of and concerning" the students?

5.  Did the circuit court err in finding Coach Walpole did not show that Jones Street Publishers acted with actual malice?

## STANDARD OF REVIEW

"When reviewing the grant of summary judgment, the appellate court applies the same standard applied by the [circuit] court pursuant to Rule 56(c), SCRCP." *Fleming v. Rose*, 350 S.C. 488, 493, 567 S.E.2d 857, 860 (2002). Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP. "Summary judgment should be granted when plain, palpable, and indisputable facts exist on which reasonable minds cannot differ." *Pee Dee Stores, Inc. v. Doyle*, 381 S.C. 234, 240, 672 S.E.2d 799, 802 (Ct. App. 2009).

"When determining if any triable issues of fact exist, the evidence and all reasonable inferences must be viewed in the light most favorable to the non-moving party." *Fleming*, 350 S.C. at 493–94, 567 S.E.2d at 860. "[S]ummary judgment is not appropriate when further inquiry into the facts of the case is desirable to clarify the application of law." *Pee Dee Stores*, 381 S.C. at 240, 672 S.E.2d at 802. "If triable issues exist, those issues must go to the jury." *BPS, Inc. v. Worthy*, 362 S.C. 319, 325, 608 S.E.2d 155, 158 (Ct. App. 2005). "A jury issue is created when there is material evidence tending to establish the issue in the mind of a reasonable juror." *Jackson v. Bermuda Sands, Inc.*, 383 S.C. 11, 17, 677 S.E.2d 612, 616 (Ct. App. 2009). "However, this rule does not authorize submission of speculative, theoretical, and hypothetical views to the jury." *Id.* (quoting *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 461, 494 S.E.2d 835, 841 (Ct. App. 1997)). Moreover, "[i]f evidentiary facts are not disputed, but the conclusions or inferences to be drawn from them are, summary judgment should be denied." *Pee Dee Stores*, 381 S.C. at 240, 672 S.E.2d at 802.

"The purpose of summary judgment is to expedite disposition of cases [that] do not require the services of a fact finder." *George v. Fabri*, 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001). "[W]hen a party has moved for summary judgment[,] the opposing party may not rest upon the mere allegations or denials of his pleading to defeat it." *Fowler v. Hunter*, 380 S.C. 121, 125, 668 S.E.2d 803, 805 (Ct. App. 2008). "Rather, the non-moving party must set forth specific facts demonstrating to the court there is a genuine issue for trial." *Id.* Furthermore, "where the federal standard applies or where a heightened burden of proof is required, there must be more than a scintilla of evidence in order to defeat a motion for summary judgment." *Hancock v. Mid-S. Mgmt. Co.*, 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009). Thus, "the appropriate standard at the summary judgment phase on the issue of constitutional actual malice is the clear and convincing standard." *George*, 345 S.C. at 454, 548 S.E.2d at 875. "Unless the [circuit] court finds, based on pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice, it should grant summary judgment for the defendant." *McClain v. Arnold*, 275 S.C. 282, 284, 270 S.E.2d 124, 125 (1980).

## LAW/ANALYSIS

### I.     Legal Background

"The tort of defamation allows a plaintiff to recover for injury to her reputation as the result of the defendant's communication to others of a false message about the plaintiff." *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 508, 506 S.E.2d 497, 501 (1998). "Slander is a spoken defamation while libel is a written defamation or one accomplished by actions or conduct." *Id.* "To establish a defamation claim, a plaintiff must prove: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable regardless of harm or the publication of the statement caused special harm." *West v. Morehead*, 396 S.C. 1, 7, 720 S.E.2d 495, 498 (Ct. App. 2011); *Erickson v. Jones Street Publishers, LLC*, 368 S.C. 444, 465, 629 S.E.2d 653, 664 (2006); *Fleming v. Rose*, 350 S.C. 488, 494, 567 S.E.2d 857, 860 (2002).

However, there are certain communications that give rise to qualified privileges. *West*, 396 S.C. at 7, 720 S.E.2d at 498. One of the qualified privileges recognized as a common law and constitutional privilege by South Carolina courts is the "fair report" privilege. *See generally Padgett v. Sun News*, 278 S.C. 26, 38, 292 S.E.2d 30, 37 (1982) (Ness, J., dissenting) (recognizing a constitutional basis for the common law privilege of fair report).

## II.     Fair Report Privilege

The fair report privilege is "the privilege to publish fair and substantially accurate reports of judicial and other governmental proceedings without incurring liability." *West*, 396 S.C. at 7, 720 S.E.2d at 498; *Padgett*, 287 S.C. at 33, 292 S.E.2d at 34 (indicating that to hold a publisher liable for an accurate report of a public action or record would constitute liability without fault and would "make it impossible for a publisher to accurately report a public record without assuming liability for the truth of the allegations contained in such record"); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991) (en banc) ("The fair report privilege encourages the media to report regularly on government operations so that citizens can monitor them."). Additionally, "[f]air and impartial reports in newspapers of matters of public interest are qualifiedly privileged." *Jones v. Garner*, 250 S.C. 479, 487, 158 S.E.2d 909, 913 (1968). "It is not necessary that [the report] be exact in every immaterial detail or that it conform to that precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account of the proceedings." Restatement (Second) of Torts § 611 cmt. f (Am. Law. Inst. 1977).

Furthermore, the publisher is not required to investigate the truth of the underlying matter. *See Padgett*, 278 S.C. at 33, 292 S.E.2d at 34 ("[O]ur decision in *Lybrand v. The State Co.*[8] completely refutes the contention that the publisher is required to go behind the allegations contained in the public record."); *see also Reuber*, 925 F.2d at 712 ("In return for frequent and timely reports on governmental activity, defamation law has traditionally stopped short of imposing extensive investigatory requirements on a news organization reporting on a governmental activity or document.").

As to the case at bar, Appellants contend the circuit court erred in holding the statements of fact in the articles are protected by the fair report privilege. Appellants argue Jones Street Publishers did not accurately report the statements made by Superintendent McGinley at the press conference. We disagree.

Under the defense of a qualified privilege, "one who publishes defamatory matter concerning another is not liable for the publication if (1) the matter is published upon an occasion that makes it [qualifiedly or] conditionally privileged, and (2) the privilege is not abused." *West*, 396 S.C. at 7, 720 S.E.2d at 499 (alteration in original) (quoting *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 334 S.C.

---

[8] 179 S.C. 208, 184 S.E. 580 (1936).

469, 484, 514 S.E.2d 126, 134 (1999)); *Jones*, 250 S.C. at 487, 158 S.E.2d at 913 ("[T]he privilege attending the publication of a news report arises by reason of the occasion of the communication, and a communication or statement [that] abuses or goes beyond the requirement of the occasion, loses the protection of the privilege."). "Whether the occasion is one [that] gives rise to a qualified privilege is a question of law." *West*, 396 S.C. at 7, 720 S.E.2d at 499. A qualified privilege arises when there is "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *Fountain v. First Reliance Bank*, 398 S.C. 434, 444, 730 S.E.2d 305, 310 (2012) (quoting *Manley v. Manley*, 291 S.C. 325, 331, 353 S.E.2d 312, 315 (Ct. App. 1987)). Furthermore, the fair report privilege "extends only to a report of the contents of the public record and any matter added to the report by the publisher, which is defamatory of the person named in the public records, is not privileged." *Jones*, 250 S.C. at 487, 158 S.E.2d at 913. "Where there is conflicting evidence, 'the question [of] whether [a qualified] privilege has been abused is one for the jury.'" *West*, 396 S.C. at 8, 720 S.E.2d at 499 (second alteration in original) (footnote omitted) (quoting *Swinton Creek*, 334 S.C. at 485, 514 S.E.2d at 134).

Here, a review of the "Melongate" article reveals a fair and substantially accurate report of the statements made by Superintendent McGinley at the press conference.[9] *See Jones*, 250 S.C. at 487, 158 S.E.2d at 913 ("Fair and impartial

---

[9] We note that at oral argument, Appellants maintained that Jones Street Publishers did not accurately report the statements made by Superintendent McGinley in an undated written statement. Superintendent McGinley's written statement provided, in pertinent part:

> [T]here was no evidence to suggest that the football players understood the negative cultural implications of their ritual that included buying a watermelon, drawing a caricature (face) on the watermelon, naming the watermelon "Bonds-Wilson," transporting the watermelon on the team bus, sitting it on the team bench and surrounding and smashing the watermelon after a victory. However, it was clear the coaches either knew or should have known about the negative racial stereotypes of this watermelon ritual.

reports in newspapers of matters of public interest are qualifiedly privileged."). Jones Street Publishers argued the following were factual statements taken from the press conference: "watermelons were smashed as part of this ritual," "there was a face drawn on them, [] there was caricature, [] monkey sounds were made, the ritual took place and that a watermelon was named Bonds Wilson." All of those statements were in fact made by Superintendent McGinley at the press conference. The article included details of how the ritual was performed, the sounds that were allegedly made by the players as described by Superintendent McGinley, and a description of the caricature that was shown at the press conference. Furthermore, Superintendent McGinley stated that all of the details she described were allegations that the school district was investigating, and the first paragraph of the article informs the reader that "allegations" were made against the football team.

Additionally, Jones Street Publishers submitted to the circuit court two affidavits from its editors, including Mr. Haire, indicating they had no reason to doubt the veracity of the statements made by Superintendent McGinley. *See Fleming*, 350 S.C. at 497, 567 S.E.2d at 861–62 ("The evidence shows [respondent] relied on the results and conclusions of an investigation conducted by two highly respected investigators. [Respondent] testified he had no reason to doubt the investigation was not thorough, solid, correct, and truthful. . . . The evidence shows [respondent] . . . had full faith in the veracity of their report."). Mr. Haire affirmed that he had known Superintendent McGinley for a period of time and "always considered her to be completely honest and trustworthy," and consequently relied upon the conclusion she drew from her in-depth investigations. Thus, Jones Street Publishers was not required to investigate the statements made by Superintendent McGinley. *See West*, 396 S.C. at 11, 720 S.E.2d at 500 ("[T]he mere failure to investigate an allegation is not sufficient to prove the defendant had serious doubts about the truth of the publication."); *id*. ("The media has no duty to verify the accuracy or measure the sufficiency of a party's legal allegations. The Constitution does not require that the press 'warrant that every allegation that it prints is true.'" (quoting *Reuber*, 925 F.2d at 717)).

Therefore, the circuit court correctly found that the factual statements reported in *City Paper*'s publications regarding the ritual were accurate accounts of comments

The entirety of the statement recounts events occurring from October 13, 2014 to October 22, 2014. Thus, it appears the statement was released after the live televised press conference that occurred on October 21, 2014. Jones Street Publishers maintained that it relied on the factual statements that were released at the live press conference.

made publicly by school district officials. *See McClain*, 275 S.C. at 285, 270 S.E.2d at 125 (holding summary judgment was proper where newspaper accurately reported information of a judicial proceeding). Thus, we find the statements of fact are protected by the fair report privilege. *See West*, 396 S.C. at 7, 720 S.E.2d at 499 ("Under this defense . . . one who publishes defamatory matter concerning another is not liable for the publication" as long as "the matter is published upon an occasion that makes it [qualifiedly or] conditionally privileged" and "the privilege is not abused." (alteration in original)). We further note that Appellants concede in their brief that,"[a]ny factual reporting by the *City Paper* regarding actual statements made by Academic Magnet or [Charleston County School District] officials is protected by the fair report privilege."

Appellants focus their arguments on the articles' use of the words "racist" and "racist douchebag." Appellants maintain that characterizing the student's actions as "racist" does not fall under the fair report privilege. However, Jones Street Publishers does not contend that using the word "racist" in the articles would fall under the fair report privilege. The circuit court also made no findings to suggest that Jones Street Publishers' use of the word "racist" was either protected or not protected under the fair report privilege. Instead, Jones Street Publishers argued, and the circuit court found, the remaining statements in the articles were opinions protected by the First Amendment.

## III. Opinions Expressed in the Article

In order to determine the level of protection that the speech at issue is entitled to under the First Amendment, we must first address whether Jones Street Publishers reported on a matter of public or private concern.

Matter of Public Concern

Appellants contend the circuit court erred in finding the opinions expressed in the articles were not actionable because they were expressions of opinions protected under the First Amendment. Appellants argue Jones Street Publishers should not be protected "because the statements are assertions that the members of the [AMHS] football team are racists." Appellants allege Jones Street Publishers' statements "concerned the character and beliefs" of Appellants and, thus, were a matter of private, not public, concern. We disagree.

At the heart of the First Amendment's protection is speech on matters of public concern. *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011). "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues

should be uninhibited, robust, and wide-open."' *Id*. at 452 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government.'" *Id*. (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)). Thus, "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *N.A.A.C.P. v. Claiborne Hardware Co*., 458 U.S. 886, 913 (1982)).

However, when "matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Snyder*, 562 U.S. at 452.

> That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: "[T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas"; and the "threat of liability" does not pose the risk of "a reaction of self-censorship" on matters of public import[ance].

*Id*. (first alteration in original) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 760 (1985)).

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id*. at 453 (citations and internal quotation marks omitted). "Whether . . . speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 562 U.S. at 454; *see Connick*, 461 U.S. at 148 n.7 ("The inquiry into the protected status of speech is one of law, not fact.").

First, we note that Appellants conceded this issue at trial and agreed with the circuit court that the speech was a matter of public concern. The following colloquy occurred between Appellants' counsel and the circuit court regarding whether the speech at issue was a matter of public or private concern:

THE COURT: Tell me this. With respect to, of course, you got two different kind[s] of [plaintiffs]. You have Mr. Walpole, then you have the players, team players. Do you seriously contend this is not a matter of public interest?

[APPELLANTS]: I don't contend that. For the coach it is. I don't think that as far as the kids it is. I think that the kids have a different standard. I think the coach—

THE COURT: Why is it a public—matter of public interest as far as the coach is concerned? He may be a public figure. They may be private figures, but the event is the event. Why [isn't it] equally a matter of public interest whether a bunch of kids did it or the coach or both of them?

[APPELLANTS]: I don't seriously contend that is not a matter of public interest. I think that it probably was and is.

Because Appellants conceded this issue at the summary judgment hearing, they cannot now argue the issue on appeal. *See TNS Mills, Inc. v. S.C. Dep't. of Revenue*, 331 S.C. 611, 617, 503 S.E.2d 471, 474 (1998) ("An issue conceded in a lower court may not be argued on appeal."); *Ex parte McMillian*, 319 S.C. 331, 335, 461 S.E.2d 43, 45 (1995) (finding an issue procedurally barred when the appellants expressly conceded the issue at trial); *see also Erickson*, 368 S.C. at 476, 629 S.E.2d at 670 ("Moreover, a party may not complain on appeal of error or object to a trial procedure [that] his own conduct has induced.").

Nonetheless, even if this matter was not conceded below, when viewing the record as a whole, we find the speech at issue addressed a matter of public concern. *See Connick*, 461 U.S. at 147–48 ("Whether . . . speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."). The School District released a press statement and held a press conference to inform the community on a matter that affected students and teachers within the district—not just at AMHS. The watermelon ritual, the School District investigation of the watermelon ritual, and Coach Walpole's removal as head coach of the football team were subjects of great interest to the Charleston community. At the press conference, Superintendent McGinley stated the board member who brought the allegations to her attention was "concerned about

the racial stereotypes" related to activities like the watermelon ritual practiced by AMHS's football team. The board member informed Superintendent McGinley that a concerned parent witnessed the ritual and reported it to the board member. Thus, the content of Mr. Haire's speech about these events concerned broad issues of interest to society at large—i.e., allegations of racial insensitivity. Moreover, the events reported during the press conference gained national attention from media outlets throughout the United States. Therefore, we find the circuit court did not err in finding this was a matter of public concern. *See Holtzscheiter*, 332 S.C. at 531–32, 506 S.E.2d at 513 (Toal, J., concurring in result) ("[M]atters of public concern are those related to the 'unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" (quoting *Dun & Bradstreet*, 472 U.S. at 759)).

Fact or Expressions of Opinion

As contended by Appellants, the "central issue is whether [a person] being referred to as a 'racist douchebag' and someone [who] condones a 'racist act' is defamatory." Specifically, the statement at issue in the first article "Melongate" provides: "Today, Charleston was consumed by one story and one story only: the removal of Academic Magnet football coach Bud Walpole amid *allegations that his players more or less behaved like racist douchebags*." (emphasis added). The statement at issue in the second article is the title itself: "Mob Rules: School district forces out superintendent who fired *coach who condoned racist ritual*." (emphasis added). Thus, we must consider whether the statements are factual assertions about Appellants. *See Milkovich v. Lorain Journal Co*., 497 U.S. 1, 19–20 (1990) ("[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations . . . where a media defendant is involved."); *see also Connick*, 461 U.S. at 148 n.7 ("The inquiry into the protected status of speech is one of law, not fact.").

"Under the First Amendment[,] there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Gertz v. Welch*, 418 U.S. 323, 339–40 (1974). Therefore, an expression of opinion that conveys a false and defamatory statement of fact can be actionable. *See Milkovich*, 497 U.S. at 18 (noting that "a wholesale defamation exemption" was not created "for anything that might be labeled 'opinion'" because "it would . . . ignore the fact that expressions of 'opinion' may often imply an assertion of objective fact").

There are certain "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Id*. at 20 (alteration in original) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)). Statements such as opinion, satire, epithets, or rhetorical hyperbole cannot be the subject of liability for defamation. *See id*. ("This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation.").

Although the Supreme Court has not delineated a test[10] to determine whether certain statements are "fact" or "opinion," the *Milkovich* court indicated that "statement[s] on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, . . . where a media defendant is involved." 497 U.S. at 19–20. Moreover, "a statement of opinion relating to matters of public concern [that] does not contain a provably false factual connotation will receive full constitutional protection." *Id*. at 20.

We do not find that the term "racist douchebag" can "reasonably [be] interpreted as stating actual facts" about Appellants. *See Milkovich*, 497 U.S. at 20 (indicating there is protection for statements that cannot "reasonably [be] interpreted as stating actual facts" about a person to ensure "that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' [that] has traditionally added" to topics of great debate); *cf. id*. at 21–22 (finding statement written in newspaper that high school coach lied under oath was actionable because the "language [was] an articulation of an objectively verifiable event").

---

[10] We note that the Fourth Circuit has adopted a set of factors to consider when distinguishing between statements of fact and opinion. *See Potomac Valve & Fitting Inc. v. Crawford Fitting Co*., 829 F.2d 1280, 1288 (4th Cir. 1987) (noting that the threshold inquiry is whether the challenged statement can be characterized as true or false; if the statement cannot be characterized as either true or false then it is not actionable); *id*. at 1287–88 (noting that if the challenged statement can be characterized as either true or false, then three additional factors must be considered to determine whether the statement is nevertheless an opinion because "a reasonable reader or listener would recognize its weakly substantiated or subjective character— and discount it accordingly"); *id*. (noting the additional factors are "the author or speaker's choice of words;" "the context of the challenged statement within the writing or speech as a whole;" and "the broader social context into which the statement fits").

Additionally, whether someone "more or less behaved like [a] racist douchebag" or whether someone condoned an act that was "racist" is susceptible to varying viewpoints and interpretations. One person may view certain behavior as disrespectful and offensive, but another person might view the same behavior as non-controversial and socially acceptable. Importantly, we note that all of the Appellants agreed during their deposition testimony that whether something is racist is a matter of opinion.[11]

Furthermore, the opinion editorials at issue were published in the "Views" section of the newspaper. This is a section of the newspaper that is dedicated to the expression of opinions by the newspaper's editors, guest editorial writers, and readers. Essentially, the article was published in a section devoted to opinions and commentary. *See Potomac Valve & Fitting Inc.*, 829 F.2d. at 1288 ("Even when a statement is subject to verification, however, it may still be protected if it can best be understood from its language and context to represent the personal view of the author or speaker who made it."). Thus, we find that the use of the term "racist" in an opinion editorial to describe a sequence of events related to a racially sensitive matter does not assert any verifiable, objectively provable fact about Appellants. We find the circuit court correctly held the use of the terms "racist" and "racist douchebag" in the articles were not actionable because they were expressions of

---

[11] Appellant Adam Ackerman was asked, "Do you believe that whether or not something is racist is a matter of opinion?" Appellant replied, "It is a matter of opinion."

Appellant R.M. was asked, "[D]o you think that people can have different opinions as to what is racist?" Appellant responded, "Absolutely."

Appellant C.F. was asked, "Do you think whether or not the watermelon ritual, the perception of the watermelon ritual, whether or not that's racist is a matter of opinion?" Appellant responded, "[I]t is a matter of opinion, but it's also—it's an opinion generated on what you've heard."

Appellant Coach Walpole was asked, "Who determines whether or not something is racist?" Appellant responded, "It's up to the—it depends on what it is, up to the individual interpretation, I don't know."

opinion and rhetorical hyperbole.[12]  *See* 3 Dan B. Dobbs et. al., *The Law of Torts* § 572 (2011) ("'[R]acist' is sometimes said to be mere name-calling and not actionable in some contexts[; however,] the term can be actionable where it plainly imputes *acts* based on racial discrimination." (emphasis added)); *see also* 50 Am. Jur. 2d *Libel and Slander* § 200 (2017) ("However, general statements charging a person with being racist, unfair, or unjust, without more, such as contained in the signs carried by protestors, constitute mere name calling and do not contain a provably false assertion of fact as required for defamation.").

Accordingly, Appellants did not meet their burden of proving that Jones Street Publishers published a false and defamatory statement and thus, summary judgment was proper.  *See West*, 396 S.C. at 7, 720 S.E.2d at 498 ("To establish a defamation claim, a plaintiff *must* prove: (1) a false and defamatory statement was made . . . ." (emphasis added)); *see also Milkovich*, 497 U.S. at 19–20 ("[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations . . . where a media defendant is involved."); *see also Boone v. Sunbelt Newspapers, Inc.*, 347 S.C. 571, 579, 556 S.E.2d 732, 736 (Ct. App. 2001) ("The plain language of Rule 56(c), SCRCP, mandates the entry of

---

[12] We note that other jurisdictions have held that referring to someone as "racist" is an expression of one's opinion and is not actionable for defamation. *See Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) (noting that calling someone a racist "is not actionable unless it implies the existence of undisclosed[] defamatory facts"); *Buckley v. Littell*, 539 F.2d 882, 893 (2d Cir. 1976) (finding that use of the word "fascist" "cannot be regarded as having been proved to be [a] statement[] of fact"); *Meissner v. Bradford*, 156 So.3d 129, 133–34 (La. Ct. App. 2014) (holding statement that former president of youth football league "has a problem with people of color" was a statement of opinion in the nature of hyperbole rather than an actionable statement of fact); *Ward v. Zelikovsky*, 643 A.2d 972, 983 (N.J. 1994) (holding statement that plaintiff hated or did not like Jews was not actionable); *id.* ("[T]he statement [that plaintiff hated or did not like Jews] cannot be distinguished from characterizations that a person is a 'racist,' 'bigot,' 'Nazi,' or 'facists.'"); *Silverman v. Daily News, L.P.*, 129 A.D.3d 1054, 1055–56 (N.Y. App. Div. 2015) (holding defendant's publication that plaintiff authored "racist writings" is a statement of opinion, not fact); *Covino v. Hagemann*, 627 N.Y.S.2d 894, 899–900 (N.Y. Sup. Ct. 1995) (holding statements that characterized plaintiff's behavior as "racially insensitive" were protected expressions of opinion and did not give rise to an action for defamation); *id.* ("In daily life [the word] 'racist' is hurled about so indiscriminately that it is no more than a verbal slap in the face[.]").

summary judgment, after adequate time for discovery[,] against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which the party will bear the burden of proof at trial." (quoting *Carolina All. for Fair Emp't v. S.C. Dep't of Labor, Licensing, and Regulation*, 337 S.C. 476, 485, 523 S.E.2d 795, 800 (Ct. App. 1999))).

Because the qualified privilege of fair report applies to the factual statements of the articles and the remaining statements in the articles are protected under the First Amendment as opinion, ideas, and rhetorical hyperbole, the statements are not actionable. Therefore, Appellants have failed to establish the first element of defamation. *See West*, 396 S.C. at 7, 720 S.E.2d at 498 ("To establish a defamation claim, a plaintiff must prove: (1) a false and defamatory statement was made . . . ."). Nonetheless, we will address the remaining issues.

## IV.    Proof of Injury

Appellants maintain the circuit court erred in finding that they have not shown proof of injury to reputation. Appellants contend they have suffered actual injury to their reputations and standing in the community as well as personal humiliation and mental anguish. Appellants argue the students are private figures and do not need to provide proof of damages to defeat summary judgment.[13] We disagree.

"[I]n a case involving an issue of public controversy or concern where the libelous statement is published by a media defendant, the common law presumptions [that] the defendant acted with common law malice and the plaintiff suffered general damages do not apply." *Erickson*, 368 S.C. at 466, 629 S.E.2d at 665. "Instead, the private-figure plaintiff must plead and prove common law malice and show 'actual injury' in the form of general or special damages." *Id.* General damages include injuries such as "injury to reputation, mental suffering, hurt feelings, and other similar types of injuries [that] are incapable of definite money valuation." *Holtzscheiter,* 332 S.C. at 510 n.4., 506 S.E.2d at 502 n.4 (quoting *Whitaker v. Sherbrook Distrib. Co*., 189 S.C. 243, 246, 200 S.E. 848, 849 (1939)). "[S]pecial damages are tangible losses or injury to the plaintiff's property, business, occupation or profession, capable of being assessed monetarily, . . ." *Id.* However, special damages do not include hurt feelings, embarrassment, humiliation, or emotional distress. *Wardlaw v. Peck*, 282 S.C. 199, 205–06, 318 S.E.2d 270, 274–75 (Ct. App. 1984). Additionally, "in a case involving an issue of public controversy or concern where the libelous statement is published by a media defendant, the common law

---

[13] Jones Street Publishers conceded that the football players were private figures.

presumption that the libelous statement is false is not applied." *Erickson*, 368 S.C. at 466, 629 S.E.2d at 665. "Instead, the private-figure plaintiff must prove the statement is false." *Id*. Appellant bears the burden of proving the defamation case by a preponderance of the evidence. *Id.* at 475, 629 S.E.2d at 670.

In viewing the evidence in the light most favorable to Appellants, Appellants did not produce evidence of either general or special damages arising from injury to their reputations as a direct result of the *City Paper*'s publications. *See Fleming*, 350 S.C. at 493–94, 567 S.E.2d at 860 ("When determining if any triable issues of fact exist, the evidence and all reasonable inferences must be viewed in the light most favorable to the non-moving party."); *see also Erickson*, 368 S.C. at 466, 629 S.E.2d at 665 ("[T]he private-figure plaintiff must plead and prove common law malice and show 'actual injury' in the form of general or special damages."). Appellants could not identify individuals who read the *City Paper*'s publications and as a result of those publications, viewed Appellants in a different light. Nor did Appellants provide evidence of any lost opportunities as a result of the articles. Appellants agreed that they did not lose any friends, remained employed at their places of employment, and were accepted to the colleges they desired to attend. At most, Appellants contended they felt "more self-conscious" and that their school had been defamed. *See Murray v. Holnam, Inc.*, 344 S.C. 129, 138, 542 S.E.2d 743, 748 (Ct. App. 2001) ("The focus of defamation is not on the hurt to the defamed party's feelings, but on the injury to his reputation." (quoting *Fleming v. Rose*, 338 S.C. 524, 532, 526 S.E.2d 732, 737 (Ct. App. 2000), *rev'd on other grounds*, 350 S.C. 488, 567 S.E.2d 857 (2002))); *see also Johnson v. Nickerson*, 542 N.W.2d 506, 513 (Iowa 1996) ("While a defamation suit can be viewed as serving the purpose of vindicating the plaintiff's character by establishing the falsity of the defamatory matter, if no harm can be established[,] the action must be regarded as trivial in nature."). Some Appellants indicated that they had been questioned about the watermelon incident by various people; however, Appellants were unable to identify those individuals and unable to concretely state whether those individuals were questioning them as a result of reading the *City Paper*'s publications. *See Jackson*, 383 S.C. at 17, 677 S.E.2d at 616 ("A jury issue is created when there is material evidence tending to establish the issue in the mind of a reasonable juror. 'However, this rule does not authorize submission of speculative, theoretical, and hypothetical views to the jury.'" (internal citation omitted) (quoting *Small*, 329 S.C. at 461, 494 S.E.2d at 841)).

As previously stated, the watermelon ritual controversy gained local and national attention resulting in reports by media outlets, including television and radio broadcasts, throughout the United States. Importantly, the *City Paper* was not the first medium to produce a story on the events. Moreover, the factual statements in

*City Paper*'s article were a substantially accurate report of the statements made by Superintendent McGinley at the live press conference. Thus, we find that Appellants did not meet their burden of showing proof of injury. *See id.* ("Finally, assertions as to liability must be more than mere bald allegations made by the non-moving party in order to create a genuine issue of material fact."); *see also Boone*, 347 S.C. at 579, 556 S.E.2d at 736 ("The plain language of Rule 56(c), SCRCP, mandates the entry of summary judgment, after adequate time for discovery against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." (quoting *Carolina All. for Fair Emp't*, 337 S.C. at 485, 523 S.E.2d at 800)).

## V. Whether Statements Were "Of and Concerning" the Students

Appellants argue the circuit court erred in finding the alleged defamatory statements were not "of and concerning" the students because the statements refer to the entire football team and not to any individual student. Appellants cite to *Fawcett Publ'ns, Inc. v. Morris*, 377 P.2d 42 (Okla. 1962)[14] for the proposition that a member of a football team may be defamed even if the individual is not specifically named.

"To prevail in a defamation action, the plaintiff must establish that the defendant's statement referred to some ascertainable person and that the plaintiff was the person to whom the statement referred." *Burns v. Gardner*, 328 S.C. 608, 615, 493 S.E.2d 356, 359 (Ct. App. 1997). "Where a publication affects a class of persons

---

[14] The case cited by Appellants is the only defamation case that our research uncovered that has held a member of a football team can prevail when the defamatory language concerns the entire team. In *Fawcett*, the Supreme Court of Oklahoma held that a fullback on the alternate squad of the University of Oklahoma football team had been defamed by an article alleging that members of the team had used amphetamines. 377 P.2d at 52. None of the players were named in the article; however, the article referred specifically to the 1956 football season. *Id.* at 47, 52. Specifically, the article stated "several *physicians observed Oklahoma players being sprayed in the nostrils with an atomizer*." *Id.* at 47. Thus, the article insinuated the players were using amphetamines. *Id.* at 44. The court held the fullback presented evidence that he was a constant player during the 1956 season; the substance administered with the atomizer was a harmless substance used to help players with mouth dryness; and he did not use amphetamines or any other narcotic drugs. *Id.* at 47. Therefore, the court determined that despite the football team consisting of sixty or seventy players, the fullback had "established his identity in the mind of the average lay reader as one of those libeled." *Id.* at 52.

without any special personal application, no individual of that class can sustain an action for the publication." *Hospital Care Corp. v. Commercial Cas. Ins. Co.*, 194 S.C. 370, 377, 9 S.E.2d 796, 800 (1940) (citation omitted). Thus, "where defamatory statements are made against an aggregate body of persons, an individual member not specially imputed or designated cannot maintain an action." *Id*. "Where defamatory words reflect upon a class of persons impartially, and there is nothing showing which one is meant, no action lies at the suit of a member of the class." *Id*. at 378, 9 S.E.2d at 800 (citation omitted); *see also* 50 Am. Jur. 2d. *Libel and Slande*r § 225 (2017) ("Under the 'group libel doctrine,' a plaintiff has no cause of action for a defamatory statement directed to some of, but less than, the entire group when there is nothing to single out the plaintiff; consequently, the plaintiff has no cause where the statement does not identify to which members it refers.").

However, in *Holtzscheiter*, our supreme court held that "[w]hile the general rule is that defamation of a group does not allow an individual member of that group to maintain an action, this rule is not applicable to a small group." *Holtzscheiter*, 332 S.C. at 514, 506 S.E.2d at 504. The *Holtzscheiter* court held a newspaper liable for publishing a statement that a murder victim lacked "family" support. *Id*. The murder victim's mother sued for defamation alleging the statement defamed her. *Id*. at 508, 506 S.E.2d at 500. The *Holtzscheiter* court indicated there was evidence from which a jury could find the statement was "of and about" the victim's mother. *Id*. at 514, 506 S.E.2d at 504. In the instant matter, by any measure, a football team would not constitute a small group—at least not under the analyses of *Holtzscheiter*.[15] *See Hospital Care Corp.*, 194 S.C. at 377-87, 9 S.E.2d at 800–04 (affirming the circuit court's order ruling that a small insurance company could not maintain a defamation action against defendants who published pamphlet stating that small insurance companies that had recently entered into the insurance business were inexperienced and financially unstable); *id*. (affirming the finding that the pamphlet

---

[15] *See Evans v. Chalmers*, 703 F.3d 636, 659–60 (4th Cir. 2012) ("One who publishes defamatory matter concerning a  group or class of persons is subject to liability to an individual member of it if, but only if, (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member." (quoting Restatement (Second) of Torts § 564A (1977))) (Wilkinson, J., concurring); *Church of Scientology Intern. v. Daniels*, 992 F.2d 1329, 1331 (4th Cir. 1993) ("[D]efamatory statement about a large group cannot support a libel action by a member of the group" (citing *Ewell v. Boutwell*, 121 S.E. 912, 915 (Va. 1924))).

was not actionable because the defamation, if any, was to a class and had no specific application to the plaintiff); *see also Burns*, 328 S.C. at 615-16, 493 S.E.2d at 360 (holding two blind citizens lacked standing to maintain defamation action on behalf of blind population in general).

Here, we conclude the circuit court did not err in finding the statements were not "of and concerning" Appellants. *City Paper*'s publication made only general statements about the conduct of the AMHS's football team as a whole. The article did not reference any names nor did it include any pictures of the members of the football team. Additionally, the *City Paper* did not publish any facts or commentary specific to any particular member of the AMHS football team. Thus, there are no statements within the articles that single out any particular member of the football team. Accordingly, Appellants have not met their burden of proving the allegedly defamatory statements concerned Appellants. *See Hospital Care Corp.*, 194 S.C. at 378, 9 S.E.2d at 800 ("Where defamatory words reflect upon a class of persons impartially, and there is nothing showing which one is meant, no action lies at the suit of a member of the class."); *see also Burns*, 328 S.C. at 615, 493 S.E.2d at 359 ("To prevail in a defamation action, the plaintiff must establish that the defendant's statement referred to some ascertainable person and that the plaintiff was the person to whom the statement referred.").

## VI. Constitutional Actual Malice

Lastly, Appellants argue the circuit court erred in finding that Coach Walpole did not show that Jones Street Publishers acted with actual malice. First, Appellants contend that Coach Walpole is a private figure and not a public official as the circuit court held. Appellants also assert the *City Paper*'s use of the word "racist" in the articles constituted actual malice. Conversely, Jones Street Publishers maintains that Coach Walpole is a public official and he must prove constitutional actual malice. Jones Street Publishers contends that Coach Walpole failed to produce evidence of actual malice. We agree with Jones Street Publishers.

"[A]n important initial step in analyzing any defamation case is determining whether a particular plaintiff is a public official, public figure, or private figure." *Erickson*, 368 S.C. at 468, 629 S.E.2d at 666. "This determination is a matter of law which must be decided by the court, . . ." *Id.* "In general, a public official is a person who, among the hierarchy of government employees, has or appears to the public to have 'substantial responsibility for or control over the conduct of governmental affairs.'" *Id*. at 469, 629 S.E.2d at 666 (quoting *Holtzscheiter*, 332 S.C. at 520 n.4, 506 S.E.2d 507 n.4 (Toal, J., concurring in result)). "In considering the question of

whether one is a public official, the employee's position must be one [that] would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id.* (quoting *Holtzscheiter*, 332 S.C. at 520 n.4, 506 S.E.2d 507 n.4 (Toal, J., concurring in result)). "The status of a public official may be deemed sufficient . . . not because of the government employee's place on the totem pole, but because of the public interest in a government employee's activity in a particular context." *Id.* at 469, 629 S.E.2d at 666–67 (quoting *McClain*, 275 S.C. at 284, 270 S.E.2d at 125).

For purposes of a First Amendment analysis, our courts have held a variety of public school administrators and employees to be public officials. *See Sanders v. Prince*, 304 S.C. 236, 403 S.E.2d 640 (1991) (finding school board members to be public officials); *Scott v. McCain*, 272 S.C. 198, 250 S.E.2d 118 (1978) (finding school trustee to be a public official). Other jurisdictions have held that public school teachers and athletic coaches are public officials for purposes of applying the *New York Times* doctrine. *See Mahoney v. Adirondack Publ. Co.*, 517 N.E.2d 1365, 1368 (N.Y. 1987) (finding a public high school football coach to be a public figure); *Johnston v. Corinthian Television Corp.*, 583 P.2d 1101, 1102 (Okla. 1978) (finding person holding the dual positions of public school coach and physical education teacher to be a public official); *Johnson v. Sw. Newspapers Corp.*, 855 S.W.2d 182, 184 (Tex. Ct. App. 1993) (finding person holding the dual position of athletic director and head football coach to be a public official).

Once it is determined that the plaintiff is a public official, pursuant to *New York Times Co. v. Sullivan*,[16] the plaintiff must show proof that the publication was made with "actual malice" or else the publication is constitutionally privileged. *See McClain*, 275 S.C. at 283, 270 S.E.2d at 124. Actual malice must be proven by clear and convincing evidence. *Elder v. Gaffney Ledger*, 341 S.C. 108, 114, 533 S.E.2d 899, 902 (2000). "Actual malice in this context has been defined as the publication of an article 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *McClain*, 275 S.C. at 283, 270 S.E.2d at 124 (quoting *New York Times*, 376 U.S. at 280). "Whether the evidence is sufficient to support a finding of actual malice is a question of law." *Elder,* 341 S.C. at 113, 533 S.E.2d at 901–02. "When reviewing an actual malice determination, [the appellate court] is obligated to independently examine the entire record to determine whether the evidence sufficiently supports a finding of actual malice." *Id.* at 113–14, 533 S.E.2d at 902.

---

[16] 376 U.S. 254 (1964).

However, a "reckless disregard" for the truth "requires more than a departure from reasonably prudent conduct." *Id*. at 114, 533 S.E.2d at 902. "There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth* of his publication." *Id*. (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). "There must be evidence the defendant had a '*high degree of awareness of . . . probable falsity*.'" *Id*. (alteration in original) (quoting *Garrison*, 379 U.S. at 74). Thus, "[a]ctual malice may be present . . . where one fails to investigate and there are obvious reasons to doubt the veracity of the [information]." *Id*. at 114, 533 S.E.2d at 902.

Here, the circuit court correctly held that Coach Walpole is a public official for purposes of applying the *New York Times* doctrine. Coach Walpole holds many positions within the School District. He is the head football coach at AMHS, the head coach of the women's basketball team at AMHS, and a teacher at Liberty Hill Academy. Coach Walpole testified that he interacts with the parents of the athletes after each game and he participates in newspaper and television interviews. Furthermore, as head coach, he is responsible for the oversight of the teams' activities.

As a public official, Coach Walpole was required to demonstrate constitutional actual malice by clear and convincing evidence. A review of the record indicates that Coach Walpole failed to produce sufficient evidence to support such a finding. *See id*. at 114, 533 S.E.2d at 902. Coach Walpole failed to produce evidence showing Jones Street Publishers had "in fact entertained serious doubts as to the truth" of the publications. *See id*. ("[T]here must be evidence at least that the defendant purposefully avoided the truth."). Jones Street Publishers provided affidavits from its editors indicating they did not have any reason to doubt the veracity of Superintendent McGinley's statements regarding the events and circumstances surrounding the watermelon ritual. *See id*. ("Actual malice is a subjective standard testing the publisher's good faith belief in the truth of his or her statements."). Thus, Jones Street Publishers was not required to investigate the School District's statements when it did not have reason to doubt its truth. *See id*. ("Actual malice may be present, . . . where one fails to investigate and there are obvious reasons to doubt the veracity of the [information]."); *id*. ("Failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."). Therefore, we conclude the circuit court correctly found Coach Walpole failed to show proof of actual malice.

**CONCLUSION**

Accordingly, we find (1) the statements of fact in the articles are protected by the fair report privilege and (2) the remaining statements in the articles are expressions of opinion, ideas, and rhetorical hyperbole protected under the First Amendment. Because we find the statements at issue are not actionable, Appellants have failed to meet their burden of proving the first element of their defamation claim, and therefore, summary judgment was appropriate.[17] Furthermore, we find Appellants (1) have not shown proof of injury to their reputations,[18] (2) have not shown that the allegedly defamatory statements were "of and concerning" Appellants, and (3) have not shown that Jones Street Publishers acted with actual malice.

**AFFIRMED.**

**WILLIAMS and HILL, JJ., concur.**

---

[17] *See West*, 396 S.C. at 7, 720 S.E.2d at 498 ("To establish a defamation claim, a plaintiff *must* prove: (1) a false and defamatory statement was made; . . ." (emphasis added)); *see also Boone*, 347 S.C. at 579, 556 S.E.2d at 736 ("The plain language of Rule 56(c), SCRCP, mandates the entry of summary judgment, after adequate time for discovery[,] against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which the party will bear the burden of proof at trial." (quoting *Carolina All. for Fair Emp't*, 337 S.C. at 485, 523 S.E.2d at 800)).

[18] *See Erickson*, 368 S.C. at 466, 629 S.E.2d at 665 ("[T]he private-figure plaintiff must plead and prove common law malice and show 'actual injury' in the form of general or special damages.").