# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Jeffrey Lance Cruce, Respondent,

v.

Berkeley County School District, Appellant.

Appellate Case No. 2018-000791

---

Appeal From Berkeley County
Kristi Lea Harrington, Circuit Court Judge

---

Opinion No. 5854
Heard February 2, 2021 – Filed September 1, 2021

---

## REVERSED

---

E. Brandon Gaskins, of Moore & Van Allen, PLLC, and
Joshua Steven Whitley, of Smyth Whitley, LLC, both of
Charleston; Andrew F. Lindemann, of Lindemann &
Davis, P.A., and Richard J. Morgan, of Burr & Forman
LLP, both of Columbia, all for Appellant.

Lucy Clark Sanders and Nancy Bloodgood, both of
Bloodgood & Sanders, LLC, of Mount Pleasant, for
Respondent.

---

**KONDUROS, J.:** Berkeley County School District (the District) appeals the
circuit court's denial of its motions for a directed verdict and a judgment
notwithstanding the verdict (JNOV) on Jeffrey Lance Cruce's defamation cause of
action. The District contends it had absolute sovereign immunity because Cruce

qualified as either a public official or a limited public figure. It also maintains Cruce failed to prove each element of defamation. We reverse.

## FACTS/PROCEDURAL HISTORY

Cruce was a high school teacher in South Carolina for twenty-eight years, an athletic director in Berkeley County at various high schools[1] for a total of twenty-one years, and head football coach at high schools for about twenty years. He began serving as head football coach, athletic director, and teacher at Berkeley High School (the School) in 2011. In December 2015, the District removed him as athletic director and football coach. The District reassigned him to a middle school as a guidance counselor starting in January of 2016. Cruce left the District and retired at the completion of the school year.

During his tenure as head football coach at the School, Cruce had one winning season and several losing seasons, including a three-wins-and-seven-losses record during his final football season. That season, Cruce used an analytics-based strategy in coaching the team.[2]

As athletic director, Cruce was certified to maintain student athlete eligibility files (eligibility files) in Berkeley County, and the eligibility files were generally audited three times a year. A few months before he was removed as athletic director, the high school league conducted an audit and determined everything was proper.

On January 7, 2016, Chris Stevens, Berkeley High School's head athletic trainer, sent an email to the School's athletic coaches—paid and volunteer—as well as others involved in the athletic department and some administrators at the School, totaling approximately forty-five recipients. The subject of the email was "Student Athlete Eligibility and Medical Files." The email stated:

> Today, January 7th 2016, myself, [C]oach Ward, and Mr.
> Gallus went into the athletic director[']s office to check
> on the status of the student files left by our previous
> athletic director. After spending some time looking
> through files it has come to my attention that there could

---

[1] The county includes seven high schools.
[2] Cruce and the District differ as to the focus of his strategy. Cruce termed it as a "less-hitting philosophy." The District referred to it as a "no-punting" philosophy.

be some documents that could be misplaced and others that are out of order.  From a liability stand point with competing sports and athletes it is necessary that all of the files be present to safeguard the athletes as well as to maintain the proper care for those athletes if something were to happen.

I will be in the [athletic director's] office during the next few day[s] to make sure the correct files are in place for competing athletes and those weightlifting after school to make sure EVERY child has the correct paperwork on file.

I would ask if you have athletes competing and/or conditioning at the present time, this includes weightlifting, that you send me a copy of that roster ASAP so that I can check your student-athletes off the "no-fly" list.  ALL students MUST have the following files in order to participate in scholastic sports:

- Risk Acknowledgment and Consent to Participate form
- Pre-participation Physical Examination form (signed by a doctor)
- Proper understanding of HIPAA and FERPA rights
- Emergency Insurance Information and Consent to Treat form
- ANY special accommodations such as asthma, allergies etc. must have a written Doctor's note filed and must have necessary treatment (Inhaler, Epi-pen) present at all times.
- Copies of Birth Certificate and Social Security Cards.

I will update everyone again next week once everything has been checked off.  Thank you in advance for your cooperation.

In 2016, Cruce filed an action against the District for wrongful termination and defamation.  As to the defamation cause of action, Cruce alleged the District's agents, while acting within the scope of their authority, made false and defamatory statements about his "fitness for his profession to employees, students, volunteers,

potential employers, and members of the community" "with conscious indifference to and complete disregard of the truth of their statements and the effect that the false statements would have on [him] and his career." Cruce asserted the statements were plain in meaning and constituted defamation per se because they stated he was unfit for his profession. He further contended the statements were made with common law malice. The District answered, raising several defenses including that the South Carolina Tort Claims Act barred the claims in whole or in part. The District asserted because Cruce could not show actual malice, his claims were barred because he was "a public official, [a] limited purpose public official, and/or any complained-of speech was on a matter of public concern."

At trial, Cruce testified Stevens was not certified to handle student athlete eligibility files and did not know what documents had to be included in the files. Cruce indicated only athletic directors are certified to maintain the athlete eligibility files. Cruce stated only head coaches were allowed to review eligibility files and most of the forty-five email recipients were not head coaches and thus those recipients did not need to know information about eligibility files. Stevens testified his job was to take care of athletic injuries and illnesses; he indicated he was not an athletic director. He agreed he was not certified to maintain eligibility files. He provided that some of the recipients of the email were former coaches.

Cruce disputed the statement in the email that the files could be a liability because his files were usually audited three times a year and the last audit that occurred was only a few months before the email was written and was "clean." Cruce further testified the information contained in the email about what documents should be in the eligibility files was incorrect. Cruce provided, "You have to be certified to -- there are certain files -- as an athletic director, there's three things you've got to have on file. You've got to have a current physical; you've got to have a birth certificate; and you've got to have their grades on file." Cruce testified several forms the email specified as missing from the files were not missing for a variety of reasons: the risk acknowledgement and consent to participate form was attached to the physical itself; HIPPA and FERPA forms were not required to be in the file; information about special accommodations for a student were written by the doctor on the physical form; and a social security card was not required to be in the file.

The principal was asked if the email was "talking about a former employee" and "talking about problems that have been found in his office," and he responded affirmatively to both questions.

Cruce and his principal's testimony at trial differed as to the focus of his coaching strategy for 2015.  Cruce maintained it was a "less-hitting philosophy."  He asserted that while not punting was part of the philosophy, it "has no bearing on what the philosophy is."  When asked if "that philosophy involved use of statistics, number of plays that were run, yards that were gained," he responded, "It was driven by offensive productivity, yes, sir."

The principal testified:

> [Cruce] said, I'm going to be using analytics, because I -- there's one gentleman in Little Rock who does the no punting and does all this stuff, so I'm going to use analytics this year.
>
> And that's where he talked about earlier about telling me about the no-kick rule.
>
> When he said, no punting, it also meant no kicking extra points, no punting under any situation, 4th and 20 doesn't matter, and no kickoffs.  So all of our kickoffs were -- basically were either muffs or short little kicks instead of deep kicks.
>
> And that's where that whole conversation kind of went down with our analytics, him explaining all of that.  And that's why analytics was number one.

The District maintained Cruce sought out media attention due to his use of a no-punt philosophy.  The District provided almost two hundred articles that mentioned the football team for the years Cruce was the coach and the following year.  The District pointed to a few articles—one from Kansas City discussing the no-punt strategy, the coach who created it, and other coaches who were using it as well as some local articles that mentioned the strategy in reporting on game outcomes or predictions for area football games during the 2015 season.  Most of the articles were summaries of or predictions for area football games over the years Cruce coached at Berkeley High School; less than ten reference the no-punt strategy.  Some of the articles are about the team the season following Cruce's departure and Cruce's lawsuit.

Cruce further testified:

> The no-punt philosophy, what you said -- the strategy of the no-punt philosophy, that wasn't the strategy. The guy in the paper in all -- everybody got enamored with the no punt. It was a philosophy based on a strategy with numbers involved and no punt was part of it. The no punt -- we punted that season.
>
> So when you assess a new philosophy, which I've done through my whole career, this philosophy worked. And everybody got enamored with the word no punt. We punted during the season. So as your philosophy takes shape, as a coach, you monitor and adjust.
>
> So there were times during the season that we did punt. So the writer of this particular article leaves out part of what was said in that, and that being that the -- putting your chips all in one spot was about the safety of the kids, about not hitting as much in practice, about taking full gear off on a Wednesday.
>
> . . . .
>
> I said it to the reporter and the reporter took liberties of what he wrote. I can't -- I can't make the reporter write everything that we talked about.

Cruce testified that as the football team's head coach, he had a Friday night radio spot one year early on at the School in 2011 or 2012. He provided that if there was a game, such as basketball, baseball, or football, the coach for that team had access to media. He indicated:

> My teams got press coverage. I just happened to be the head coach, but they wrote about my team, not necessarily about me.
>
> . . . .
>
> I had opportunities to praise my kids and give stats that would promote my program and my kids, yes, sir, I did.

. . . .

> Well, the old saying goes, the buck stops here, and if they
> were going to talk to anybody, they were going to talk to
> me.  So they didn't talk to an assistant coach because
> there w[ere] no wins or losses by their names.  It was
> always the head coach.  So, yes, sir, most interviews you
> see in the paper will be from the head coach.

At the close of Cruce's case[3] and again at the close of all the evidence, the District moved for a directed verdict on several grounds, including sovereign immunity under the Tort Claims Act, section 15-78-60(17) of the South Carolina Code (2005).  The District argued Cruce was a limited public figure, which required that he prove actual malice.  The District also asserted no statement in Stevens's January 7, 2016 email was defamatory.  The circuit court granted a directed verdict in the District's favor on the wrongful termination claim.  The circuit court also granted a directed verdict to the District on the defamation claim based on the District's silence when it removed Cruce as head football coach and athletic director.  However, the circuit court denied the District's directed verdict motion on the remaining defamation claim arising from the January 7, 2016 email.  The circuit court found as a matter of law Cruce did not qualify as a limited public figure under defamation law.

The jury found for Cruce and awarded him $200,000 in damages.  The District moved for a JNOV, new trial absolute, or a new trial *nisi* remittitur.  On March 29, 2018, the circuit court denied the District's posttrial motions.  This appeal followed.

**STANDARD OF REVIEW**

When ruling on a directed verdict motion, "the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the" nonmoving party.  *Sabb v. S.C. State Univ.*, 350 S.C. 416, 427, 567 S.E.2d 231, 236 (2002).  This court must follow the same standard. *Welch v. Epstein*, 342 S.C. 279, 299, 536 S.E.2d 408, 418 (Ct. App. 2000).  A motion for JNOV "is a renewal of the directed verdict motion."  *Glover v. N.C.*

---

[3] Due to timing issues, the circuit court continued the motions until after the District called its witness.

*Mut. Life Ins. Co.*, 295 S.C. 251, 256, 368 S.E.2d 68, 72 (Ct. App. 1988).  "If more than one reasonable inference can be drawn or if the inferences to be drawn from the evidence are in doubt, the case should be submitted to the jury."  *Chaney v. Burgess*, 246 S.C. 261, 266, 143 S.E.2d 521, 523 (1965).  When the only reasonable inference from the evidence is the plaintiff has failed to prove a material element of his cause of action, it becomes the duty of the court to grant a directed verdict against the party having the burden of proof.  *Bragg v. Hi-Ranger, Inc.*, 319 S.C. 531, 534-35, 462 S.E.2d 321, 323 (Ct. App. 1995).  This court will reverse the trial court's denial of a motion for a directed verdict only when no evidence supports its ruling.  *Steinke v. S.C. Dep't of Labor, Licensing & Regulation*, 336 S.C. 373, 386, 520 S.E.2d 142, 148 (1999).  "When reviewing a motion for directed verdict, this court . . . may only reverse a jury's verdict if the factual findings implicit within it are contrary to the only reasonable inference from the evidence."  *Maher v. Tietex Corp.*, 331 S.C. 371, 376, 500 S.E.2d 204, 207 (Ct. App. 1998).  "When considering directed verdict motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence."  *Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 463, 629 S.E.2d 653, 663 (2006).

## LAW/ANALYSIS

The District contends the circuit court erred in denying its motion for directed verdict and JNOV as it had absolute sovereign immunity under the Tort Claims Act because Cruce was a public official or a limited public figure.  It argues because Cruce was a public official or limited public figure, he was required to prove the District acted with actual malice.  It asserts section 15-78-60(17) of the South Carolina Code (2005) establishes a governmental entity is not responsible for employee conduct constituting actual malice.  We agree.

The tort of defamation allows plaintiffs to recover for injuries to their reputation as the result of defendants' communications to others of falsities regarding the plaintiffs.  *Boone v. Sunbelt Newspapers, Inc.*, 347 S.C. 571, 580, 556 S.E.2d 732, 737 (Ct. App. 2001).  "Defamatory communications take two forms: libel and slander.  Slander is a spoken defamation while libel is a written defamation or one accomplished by actions or conduct.  If a communication is libelous, then the law presumes the defendant acted with common law malice."  *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 334 S.C. 469, 484, 514 S.E.2d 126, 133-34 (1999) (citation omitted).  "In cases involving the defamation of a public official, the plaintiff must prove that the defendant acted with constitutional actual malice, that is, with knowledge that the statement was false or with reckless disregard of its

falsity."  *Sanders v. Prince*, 304 S.C. 236, 239, 403 S.E.2d 640, 643 (1991) (citing *N.Y. Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

"The Tort Claims Act 'is the exclusive civil remedy available for any tort committed by a governmental entity, its employees, or its agents except as provided in [section] 15-78-70(b)'" of the South Carolina Code (2005).  *Curiel v. Hampton Cnty. E.M.S.*, 401 S.C. 646, 649, 737 S.E.2d 854, 856 (Ct. App. 2012) (quoting *Wells v. City of Lynchburg*, 331 S.C. 296, 302, 501 S.E.2d 746, 749 (Ct. App. 1998)); *see also* S.C. Code Ann. § 15-78-200 (2005) ("Notwithstanding any provision of law, this chapter, the 'South Carolina Tort Claims Act', is the exclusive and sole remedy for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty.").  The Tort Claims Act provides: "The State, an agency, a political subdivision, and a governmental entity are liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained herein."  *Proctor v. Dep't of Health & Envtl. Control*, 368 S.C. 279, 290, 628 S.E.2d 496, 502 (Ct. App. 2006) (quoting S.C. Code Ann. § 15-78-40 (2005)).

"Under the [Tort Claims Act], a governmental entity is not liable for a loss that results from 'employee conduct outside the scope of his official duties or which constitutes actual fraud, *actual malice*, intent to harm, or a crime involving moral turpitude.'"  *Gause v. Doe*, 317 S.C. 39, 41, 451 S.E.2d 408, 409 (Ct. App. 1994) (emphasis added by court) (quoting S.C. Code Ann. § 15-78-60(17) (Supp. 1993)).  "In a case involving the defamation of a public official, the plaintiff must prove the defendant acted with actual malice."  *Id.* (footnote omitted).  "The [Tort Claims Act] clearly excludes a governmental entity's liability for an individual's loss stemming from a state employee's conduct that constitutes actual malice."  *Id.* at 42, 451 S.E.2d at 409.  In *Gause*, this court held "the [Tort Claims Act] bars [the plaintiff's] slander claim against the [police department] because [the plaintiff] must prove the [police department's] employee's conduct constituted actual malice in order to recover on this claim."  *Id.*

An important step in beginning to analyze a defamation case is determining whether the plaintiff is a public official, public figure, or private figure.  *Garrard v. Charleston Cnty. Sch. Dist.*, 429 S.C. 170, 208, 838 S.E.2d 698, 718 (Ct. App. 2019), *petition for cert. filed*.  This determination is a matter of law to be decided by the court.  *Id.*  In considering whether a person is a public official, the employee's position must invite public scrutiny and discussion of the person

holding it, unrelated to the current controversy. *Id.* A public official's status may be sufficient because of the public interest in that official's activity in a particular context instead of the official's place in the organization's hierarchy. *Id.*

> For purposes of a First Amendment analysis, our courts have held a variety of public school administrators and employees to be public officials. *See Sanders v. Prince*, 304 S.C. 236, 403 S.E.2d 640 (1991) (finding school board members to be public officials); *Scott v. McCain*, 272 S.C. 198, 250 S.E.2d 118 (1978) (finding school trustee to be a public official). Other jurisdictions have held that public school teachers and athletic coaches are public officials for purposes of applying the *New York Times* doctrine. *See Mahoney v. Adirondack Publ'g Co.*, 517 N.E.2d 1365, 1368 (N.Y. 1987) (finding a public high school football coach to be a public figure); *Johnston v. Corinthian Television Corp.*, 583 P.2d 1101, 1102 (Okla. 1978) (finding person holding the dual positions of public school coach and physical education teacher to be a public official); *Johnson v. Sw. Newspapers Corp.*, 855 S.W.2d 182, 184 (Tex. Ct. App. 1993) (finding person holding the dual position of athletic director and head football coach to be a public official).

*Garrard*, 429 S.C. at 208, 838 S.E.2d at 718.

In *Garrard*, a high school football coach (Coach Walpole) brought suit against a newspaper for defamation. *Id.* at 181, 838 S.E.2d at 703-04. The circuit court granted summary judgment to the newspaper, finding Coach Wadpole was a public official and was required to prove the newspaper acted with actual malice. *Id.* at 188, 838 S.E.2d at 707. Coach Wadpole appealed, arguing he was a private figure and not a public official. *Id.* at 207, 838 S.E.2d at 718. This court determined "Coach Walpole is a public official for purposes of applying the *New York Times* doctrine." *Id.* at 209, 838 S.E.2d at 719. The court noted "Coach Walpole holds many positions within the School District"—head football coach, head coach of the women's basketball team, and teacher. *Id.* "Coach Walpole testified that he interacts with the parents of the athletes after each game and he participates in newspaper and television interviews. Furthermore, as head coach, he is responsible for the oversight of the teams' activities." *Id.* at 209-10, 838 S.E.2d at

719.

Initially, Cruce argues the District's argument he was a public official is not preserved because the District did not raise it during the directed verdict motion and first raised it in the JNOV motion. During the directed verdict motion, the District repeatedly asserted Cruce was a limited public figure, and Cruce disagreed. However, the District also referenced the related concept of a public official and asserted other jurisdictions have held that all public employees are public officials. In response to questioning by the circuit court if the statements had to relate to coaching for the actual malice standard to apply, the District answered "it does not matter if you follow the line of cases that says that every public employee is a public official. Because in that case, whether a teacher or as a coach, he's a public employee, he's a public official, and all public officials must prove actual malice." "[A] party is not required to use the exact name of a legal doctrine in order to preserve the issue." *Herron v. Century BMW*, 395 S.C. 461, 466, 719 S.E.2d 640, 642 (2011). As our supreme court has observed, "it may be good practice for us to reach the merits of an issue when error preservation is doubtful." *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 330, 730 S.E.2d 282, 285 (2012). Accordingly, the issue was sufficiently argued to the circuit court to address it on appeal.

Based on this court's decision in *Garrard*, the circuit court erred in not finding Cruce was a public official or a limited public figure.[4] Cruce was an athletic director, a football coach, and a teacher, similar to Coach Wadpole in *Garrard*, who was a coach of two different teams, including football, and a teacher. Accordingly, Cruce was a public official.

Because Cruce was a public official, he has the burden of proving actual malice. Under the Tort Claims Act, the District, as a governmental entity, is not liable for a loss resulting from employee conduct that constitutes actual malice. *Gause*, 317 S.C. at 41, 451 S.E.2d at 409. Therefore, the Tort Claims Act bars Cruce's defamation action because he has to prove the District's employee's conduct constituted actual malice in order to recover on this claim. *See id.* at 42, 451 S.E.2d at 409 ("The [Tort Claims Act] clearly excludes a governmental entity's liability for an individual's loss stemming from a state employee's conduct that constitutes actual malice. We therefore agree with the trial court that the [Tort

_____

[4] Because our court's opinion in *Garrard* was not issued until November of 2019, it was not available to the circuit court in the present case as the trial here occurred in 2017 and the circuit court issued its posttrial order in 2018.

Claims Act] bars [the plaintiff's] slander claim against the [police department] because [the plaintiff] must prove the [police department's] employee's conduct constituted actual malice in order to recover on this claim."); *see also Kennedy v. Richland Cnty. Sch. Dist. Two*, 428 S.C. 98, 118, 833 S.E.2d 414, 425 (Ct. App. 2019) ("[A]ctual malice does, in fact, refer to constitutional malice when defamation involves the First Amendment, a public official, or an issue of public concern.").[5]

Accordingly, the Tort Claims Act bars the action as Cruce was required to prove actual malice because he was a public official. Therefore, the circuit court's denial of the District's motion for directed verdict and JNOV on Cruce's defamation cause of action is

**REVERSED.**

**GEATHERS and MCDONALD, JJ., concur.**

---

[5] The District also contends the circuit court erred in denying its motion for directed verdict and JNOV because Cruce failed to prove each element of his defamation cause of action. It contends the email was not false and defamatory. It also asserts Cruce presented no evidence the email was sent with common law malice or recklessness as to show conscious indifference or that the email proximately caused any damages. Based on our holding that Cruce is a public official or limited public figure, we need not address this issue. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).